**CLARK EQUIPMENT COMPANY and Clark Equipment, A. G., Appellants-Appellees,**

v.

**Louis J. KELLER and Cyril N. Keller, Appellees-Appellants.**

**Nos. 76–1918 and 76–2009.**

United States Court of Appeals, Eighth Circuit.

Submitted Aug. 31, 1977.

Decided Feb. 17, 1978.

---

John D. Kelly, Vogel, Vogel, Brantner & Kelly, Fargo, N. D., Fred E. Schulz, Thomas D. Allen, Kay Schichtel, Wildman, Harrold, Allen, & Dixon, Chicago, Ill., Jack Toliver, Buchanan, Mich., for Clark Equipment.

Malcolm L. Moore and Herman H. Bains, Williamson, Bains & Moore, Minneapolis, Minn., for Keller, et al.

Before GIBSON, Chief Judge, and HEANEY and WEBSTER, Circuit Judges.

GIBSON, Chief Judge.

The two consolidated cases underlying the present appeal and cross-appeal arise out of a patent license contract whereunder Louis and Cyril Keller, residents of North Dakota, granted exclusive licenses on three interrelated patents to Clark Equipment Company, a corporation incorporated under the laws of Delaware and with its principal place of business in Michigan. In a similar license agreement, the Kellers granted to Clark Equipment A.G. (CEAG), a Swiss corporation which is a wholly owned subsidiary of Clark, an exclusive license under certain foreign patents corresponding to the licensed patents in the agreement with Clark. The patents involved relate to self-propelled, three- and four-wheel skid steer loader vehicles manufactured by Clark in Gwinner, North Dakota. Patent 3,151,503 (503 patent) is a mechanical patent entitled "transmission system"; Patent 3,231,117 (117 patent) is a mechanical patent entitled "tractor vehicle and drive therefor"; Patent 195,254 (254 patent) is a design patent entitled "self-propelled loader."

*Civil Action 4875*

In October 1972, Clark filed a civil action against the Kellers pursuant to 28 U.S.C. §§ 2201 and 2202, seeking a declaration of the rights and obligations of the parties under their license agreement and alleging that because the three patents forming the subject matter of the license were invalid, the license contract was unenforceable. This declaratory judgment action, which was filed in the Western District of Michigan, was transferred to the District of North Dakota in August 1973. In September 1973, the Kellers filed an answer and counterclaim. The counterclaim was for royalties allegedly due from Clark under its license agreement with the Kellers and under certain nonexclusive sublicense contracts between Clark and others. In their counterclaim, the Kellers also alleged that Clark or its predecessor in interest, the Melroe Company, had been negligent in failing to comply with the requirements of 35 U.S.C. § 102(b) by neglecting to file a patent application on the 117 patent within the one-year period after the invention had been in public use or on sale.

In response to this negligence claim, Clark filed a third-party complaint against the law firm of Williamson, Bains and Moore as third-party defendant. Clark alleged that if there had been negligence in the filing of the application for the 117 patent, it had been that of the third-party defendant, who had represented Louis Keller and Clifford Melroe, the joint inventors of the mechanism underlying the 117 patent, and who had had a professional obligation to investigate the facts and see that the application was timely filed. The cases presently before this court do not include issues of negligence or possible liability for

late filing of the 117 patent application, for on April 29, 1974, the District Court[1] ordered that Clark's third-party complaint and that portion of the Kellers' counterclaim pertaining to these issues be tried separately from and after the present declaratory judgment action was tried.

### Civil Action 4839

On July 25, 1973, the Kellers filed a separate action against Clark in the District of North Dakota. This action, which embodied the allegations in the answer and counterclaim for royalties due filed in Civil Action 4875, named CEAG as an additional defendant. The complaint alleged that, pursuant to a license agreement with the Kellers, CEAG was an exclusive licensee under certain foreign patents corresponding to the licensed patents in the agreement with Clark, and that CEAG had failed to account for and pay royalties due thereunder. Jurisdiction was based upon diversity of citizenship. This action was consolidated with Civil Action 4875 on December 21, 1973.

### Consolidated Actions

CEAG responded to the complaint in Civil Action 4837 with motions to dismiss in which it alleged lack of in personam jurisdiction, absence of proper service of process and failure of proper jurisdictional amount. The District Court denied these motions, *Keller v. Clark Equipment Co.,* 367 F.Supp. 1350 (D.N.D.1973); CEAG reasserted its jurisdictional defenses in its answer.

On July 18, 1974, the District Court ordered a separate trial on the issue of the validity of the three patents. The trial on this severed issue ran for some 33 days in early 1975. The 30-volume trial transcript includes the testimony of 46 witnesses; 546 exhibits were also introduced into evidence. Following the trial, the district judge filed a lengthy, unpublished memorandum opinion in which he ruled that the 503 and 254 patents were valid, and that the 117 patent

was invalid. Clark appeals the judgment of the District Court on all three patents; the Kellers cross-appeal on the 117 patent. CEAG appeals from the District Court's rulings on its jurisdictional allegations and defenses.

### Jurisdictional Issues

■ Before addressing the merits of the patent issues raised on this appeal and cross-appeal, we will consider CEAG's jurisdictional contentions. The District Court initially rejected CEAG's jurisdictional defenses in a memorandum opinion directed solely to this issue and entered prior to trial. *Keller v. Clark Equipment Co.,* 367 F.Supp. 1350 (D.N.D.1973). CEAG has continued to assert a lack of in personam jurisdiction. In its lengthy memorandum opinion on the patent validity issues of this case, the District Court did not re-analyze CEAG's jurisdictional assertions. It simply took note of their continuing nature and cited its previous opinion denying CEAG's jurisdictionally based motion to dismiss.

In its initial consideration of CEAG's motion to dismiss, the District Court made the following findings of fact and inferences therefrom relative to jurisdiction over CEAG. CEAG, a corporation organized under the laws of Switzerland, is a wholly owned subsidiary of Clark, a Delaware corporation doing business in North Dakota. The present case concerns separate manufacturing licenses between Clark and the Kellers, who are residents of North Dakota, and CEAG and the Kellers. Each agreement was executed on May 19, 1971. The Clark-Keller agreement was subscribed by J. Becket (sic), as vice-president of Clark Equipment Company. The CEAG-Keller agreement was also signed by J. Becket (sic), this time in the capacity of vice-president of CEAG. Both agreements give Clark's Buchanan, Michigan, address for purposes of notice to the licensee and provide for continuing royalty payments to be made to the Kellers, residents of North

---

1. The Honorable Paul Benson, Chief Judge, United States District Court for the District of North Dakota.

Dakota. In the instant case, service on CEAG was made pursuant to Fed.R.Civ.P. 4(d)(7) by serving the summons and complaint on an officer of Clark at its Melroe Division in Gwinner, North Dakota. CEAG maintains a liaison engineering .employee at the Melroe Division of Clark in North Dakota.

It can be reasonably inferred that CEAG became aware of the patents through its close association with the Melroe Division of Clark. Moreover, the factual situation here supports the inference that CEAG, or someone from Clark acting on behalf of CEAG, contacted the Kellers in North Dakota about the foreign patents, in contemplation of securing a European arrangement analogous to Clark's American arrangement exploiting the domestic patents in question. Irrefragably, CEAG sought out the Kellers in North Dakota, and the Clark-Keller and CEAG-Keller licensing agreements were handled by Clark's counsel for both Clark and CEAG. In this transaction, it clearly appears that Clark was acting for and on behalf of its wholly owned subsidiary, CEAG, and that the same individual signed both agreements on behalf of Clark and CEAG.

We have reviewed the record as a whole, giving particular attention to the documents from which the bulk of the District Court's jurisdictional findings and inferences are derived, and we can find no basis for rejecting these findings as clearly erroneous.[2] Moreover, we believe that they provide adequate support for the District Court's conclusions that CEAG had "minimum contacts" with North Dakota, which rendered in personam jurisdiction proper, and that even though CEAG itself was not doing business in North Dakota, CEAG and Clark were inextricably involved with the Kellers in the negotiations and execution of the patenting licensing agreements.

■ CEAG attacks the District Court's jurisdictional conclusion on several bases. We have considered its contentions in light of the District Court's careful analysis of this issue and find them to be without merit. Presence by the defendant in the forum state is not a jurisdictional prerequisite. *McGee v. International Life Insurance Co.,* 355 U.S. 220, 222–23, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); *Electro-Craft Corp. v. Maxwell Electronics Corp.,* 417 F.2d 365, 369 (8th Cir. 1969). It is only necessary that the defendant have sufficient minimum contacts with the forum state so that requiring it to defend itself there will not offend traditional notions of fair play and substantial justice. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945); *Aaron Ferer & Sons Co. v. Atlas Scrap Iron & Metal Co.,* 558 F.2d 450, 454 (8th Cir. 1977). The District Court found that service had been made in compliance with the law of North Dakota[3] and that there were minimum contacts between CEAG and North Dakota in CEAG's licensing agreement with the Kellers, who are residents of North Dakota, and in its extremely close relationship to its parent corporation, Clark, which did business in North Dakota. The District Court did not consider the mere existence of a parent-subsidiary relationship adequate to establish minimum contacts with North Dakota. This relationship was merely one of several factors which added up to the requisite minimum contacts for in personam jurisdiction. We find neither factual nor legal error in the District Court's disposition of CEAG's jurisdictional defenses and agree that there is in personam jurisdiction over CEAG.

---

2. CEAG takes particular exception to the District Court's finding that CEAG had a liaison officer at the Melroe Division of Clark in Gwinner, North Dakota. We do not believe that this finding has been shown to be clearly erroneous. Moreover, we note that even if it be assumed that there was no liaison officer in North Dakota, there remains adequate factual support in the record for the District Court's jurisdictional conclusion.

3. Pursuant to Rule 4(d)(2)(D) of the North Dakota Rules of Civil Procedure, service of process may be made within the state on a foreign corporation by delivering a copy of the summons "to one who acted as an agent for the defendant with respect to the matter upon which the claim is based and who was an agent of the defendant at the time of service."

784

## Patent Issues

The complexity of this case compels individual analysis of each patent. Certain facts are common to all three patents, however, and we believe that their recitation here will provide an appropriate general introduction to the purposes and nuances of the individual patents.

The Kellers originally granted an exclusive license on the three patents at issue here to Melroe Manufacturing Company (Melroe) in 1964. In 1969, Clark acquired Melroe and succeeded to its rights under the license agreement with the Kellers. In 1971, Clark and the Kellers entered into a new licensing agreement which superseded the 1964 Melroe-Keller agreement and which contained a clause based upon *Lear v. Adkins*, 395 U.S. 653, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969), specifically permitting Clark to challenge the validity and scope of the licensed patents.

The three patents in dispute in this litigation have been involved in two previous lawsuits. In the first action, which was filed and concluded before Clark acquired Melroe, the Kellers and Melroe sued Universal Manufacturing Company (Universal) in the Eastern District of Virginia for infringement of the 503, 117 and 254 patents. This suit was settled out of court. Pursuant to a stipulation containing an acknowledgment of the validity of the three patents, a consent decree and judgment were entered. By this settlement, Universal took a sub-license from Melroe on the three patents and agreed to pay royalties to Melroe. J. I. Case Company subsequently purchased Universal and acquired its rights under the Melroe-Universal license agreement.

In 1968, these patents engendered a second round of litigation, when Owantonna Manufacturing Company (Owantonna) sued Melroe and Cyril Keller in the District of Minnesota in an effort to have the 503, 117 and 254 patents declared invalid.[4] Clark was substituted as party defendant after its acquisition of Melroe in 1969. This

suit also ended in a settlement which incorporated an agreement whereby Owantonna was granted a sub-license by Clark on the three patents.

### 503 patent

Louis Keller and his brother Cyril operated a general repair and blacksmith shop in Rothsay, Minnesota, during the 1950's. In 1954, the Kellers became acquainted with Eddie Velo, a local grain and turkey farmer. In the early summer of 1956, Velo discussed with the Kellers the problems he had experienced in having manure accretions removed from his turkey barns. The barns had to be cleaned by hand, because their structure precluded the use of any mechanical loaders or tractors then available to Velo. Velo wanted to mechanize the cleaning process, and he envisioned a light, highly maneuverable loader vehicle as a desirable means of doing so. He described to the Kellers the type of machine which he felt would be necessary, citing as an example an Owantonna windrower he had once owned, which, he believed, had had a separate reverse and forward belt drive on each side and a caster wheel arrangement in the rear.

After contemplating the Velo barn cleaning problem during the summer of 1956, the Kellers presented a free-hand sketch of a loader to Velo. Pursuant to an understanding that Velo would pay for materials and compensate them for out-of-pocket costs and some of their labor, the Kellers began building a self-propelled loader in late October 1956. Because of their elementary design methods, the Kellers invented as they built. The Velo loader, which took approximately three months to complete and was delivered to Velo in February 1957, incorporated a rear-mounted engine, a belt drive to two forward driving wheels, and a single free-castering rear wheel. In March 1957, Velo paid the Kellers $1,349.00 as compensation for parts, material and some of the labor that went into building the loader.

---

4. *See Owantonna Mfg. Co., Inc. v. Melroe Co.*, 301 F.Supp. 1296 (D.Minn.1969), which pertains to the preliminary stages of this litigation.

The relationship between the Kellers and Velo was one in which the Kellers were kept closely advised of the loader's performance and were allowed unlimited access to the machine. Between February 1957 and the summer of 1958, the Kellers modified and improved the Velo loader, which manifested certain operational problems. The most serious problem concerned the loader's belt drive. The shifting of the loader's idler lever created friction and heat which caused the drive belts on each side of the loader to stretch. The stretching resulted in a loss of driving power in both forward and reverse. When the belt on one side alone stretched, the loader would drive only in circles. These problems prompted the Kellers to develop a clutch system that would eliminate the belt drive. During the spring of 1958, they constructed a test plate resembling the side plate of the Velo loader. Upon this plate, they began to develop the clutch assembly which ultimately became the transmission system covered by the 503 patent. Around the end of July 1958, the cam-actuated clutch drive mechanism recited in each of the four claims of the 503 patent was installed in the Velo loader. The cam-actuated clutch drive provided more positive, responsive and reliable steering, starting and stopping control.

Prior to December 1, 1957, the critical date under 35 U.S.C. § 102(b)[5] with respect to the 503 patent, the Kellers built no other loaders. In January or February 1958, they built several loaders equipped with the belt drive used in the original Velo loader rather than the cam-actuated clutch drive assembly covered by the 503 patent. Three of these loaders were delivered to Jenoff, Inc. of Fergus Falls, Minnesota, in the spring of 1958, but the record contains no evidence that the Kellers were in contact with Jenoff about their loader prior to December 1, 1957.

The application for the 503 patent was filed on December 1, 1958. The 503 patent, entitled "transmission system", contains four independent claims, each of which is specifically directed to a particular cam-actuated clutch drive mechanism having independently rotatable propulsion wheels which may be independently actuated by the drive mechanism for driving the vehicle backward or forward and for steering it. The 503 patent, which is a mechanical patent of 17 years' duration, was granted to the Kellers by the Patent Office on October 6, 1964. The District Court sustained the validity of the 503 patent.

In arguing on appeal that the trial court erred in holding the 503 patent valid, Clark impugns the correctness of essentially every step in the exhaustive factual and legal analysis made by the District Court. We will address Clark's contentions seriatim, after briefly introducing the basic tenets of patent law that must be applied to determine the validity of all three of the patents at issue here.

█ In order to be patentable, an invention must be useful, novel and nonobvious. The utility of the inventions patented here is not in question; the parties contest only the issues of novelty, or compliance with the patent requirements of § 102(b), and nonobviousness. The standards for determining whether an invention possesses novelty are set forth in 35 U.S.C. § 102. For the purposes of this first inquiry, we are concerned only with that aspect of 35 U.S.C. § 102(b) which precludes patentability where an invention has been in public use or on sale in this country more than one year prior to the date of the application for patent in the United States.

█ Insofar as the requirement of nonobviousness is concerned, 35 U.S.C. § 103 sets forth the standard for determining whether the subject matter of an invention is nonobvious.

A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of

---

**5.** To be patentable under § 102(b), the invention must not have been "in public use or on sale in this country, more than one year prior to the date of the application for patent in the

United States." The date one year prior to the date of application is often referred to as the critical or statutory bar date with respect to the invention sought to be patented.

this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

35 U.S.C. § 103. The Supreme Court has fleshed out the skeletal framework of § 103 by providing guidelines for making an analysis of nonobviousness.

Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy.

*Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966). Clearly, the test for nonobviousness requires basic factual as well as legal inquiries, *Graham v. John Deere Co., supra* at 17, 86 S.Ct. 684, and is one that must be resolved upon a case-by-case analysis. *Woodstream Corp. v. Herter's, Inc.,* 446 F.2d 1143, 1150 (8th Cir. 1971).

(1) *scope of patent claims*

The 503 patent is entitled "transmission system". Clark contends that the District Court misconstrued the scope of the claims of the 503 patent by limiting them to a transmission system only and ignoring their integral relationship to a vehicle. A mere reading of the District Court's construction of the scope of the 503 patent claims belies this contention.

The 503 patent contains four independent claims. Each claim is specifically directed to a particular cam actuated clutch drive mechanism for a self propelled vehicle having independently rotatable propulsion wheels which may be independently actuated by the aforesaid drive mechanism for driving the vehicle forward and backward, and for steering it.

*Clark Equipment Co. v. Keller,* Nos. 4875 and 4839, slip op. at 11 (D.N.D. Sept. 23, 1976). The District Court, in delineating the scope of the claims of the 503 patent, explicitly recognized that the basic purpose of the cam-actuated clutch transmission system was the steering and driving of a vehicle. Thus, the claims of the 503 patent were in fact construed just as appellant Clark argues they should have been, and Clark's contention requires no further consideration.

(2) *exclusion of Velo loader from prior art*

■ In order to make a determination of obviousness under 35 U.S.C. § 103, there must be a consideration of the differences between the invention and the prior art. Clark contends that the District Court erroneously excluded the Velo loader from the prior art and, therefore, made an incorrect obviousness analysis on the 503 patent. The basis of Clark's contention is the premise that the Velo loader was prior art under § 103 because it was in public use or on sale prior to December 1, 1957, the statutory bar date under § 102 for the 503 patent.[6] The trial court held that the Velo loader was neither on sale nor in public use prior to December 1, 1957, and that its use

**6.** On appeal, Clark has specifically waived the argument that this purported public use or on-sale activity rendered the 503 patent invalid under § 102(b); it argues only that these activities caused the Velo loader to be prior art under § 103. The anomaly of Clark's position is obvious: it relies on § 102(b) for a definition of prior art applicable to § 103, but chooses not to invoke the actual bar of § 102(b) itself. We can find no logical or legal explanation for this peculiar argument, and our disposition of this contention makes speculation on this point unnecessary.

prior to that date was experimental.[7] Upon a thorough review of the record, we are convinced that the trial court applied appropriate legal principles to reach these conclusions, and that they are based upon correct findings of fact.

Moreover, even if the trial court erred in determining that the Velo loader was not prior art, this error leaves its obviousness analysis unvitiated, for despite its finding that the Velo loader was experimental, the trial court went on to assume *arguendo* that the Velo loader was prior art and to analyze the obviousness of the 503 patent from that standpoint. The belt-driven Velo loader, which was not disclosed as prior art to the Patent Office, did not contain the cam-actuated clutch mechanism on which all four of the claims of the 503 patent were allowed. The trial court found:

> Even if the original Velo loader as it existed prior to the critical date of December 1, 1957, is considered prior art to the 503 patent as having been in public use or on sale for more than one year before the 503 application was filed, this loader is no better prior art than the Loyd patent cited and relied upon by the Examiner, with respect to the particular clutch drive arrangement for a vehicle in combination with the cam actuation mechanism on which all four claims of the 503 patent were allowed. There are more of the elements in Loyd in the combination set forth in the claims of the 503 patent * * * than there are in the Keller Velo loader * * *.

*Clark Equipment Co. v. Keller, supra,* slip op. at 19. Clark does not challenge the correctness of this finding;[8] nor does our independent review of the record reveal any reason to believe that it is incorrect.

(3) *exclusion of White patent from prior art*

The White patent, which was not cited by the Patent Office, describes a windrower with a "steering structure for farm implements and the like." At trial and on appeal, Clark has intimated that this was the machine mentioned by Eddie Velo to the Kellers in the summer of 1956. On this basis, Clark contends that the White patent was prior art for the 503 patent and that the trial court erred in refusing to consider the White patent as prior art in its analysis of the obviousness of the 503 patent.

This contention is unconvincing for several reasons. First, we note that its basis, the testimony of Eddie Velo, is equivocal, for Velo could not testify with certainty that the windrower he mentioned to the Kellers was the machine described by the White patent. Even if we assume an identity between the White patent and the windrower with which Velo was acquainted, however, we can perceive no error in the trial court's exclusion of the White patent from the prior art or, indeed, a basis for any other disposition of this issue. It appears that Clark did not choose to argue to the trial court that the White patent was prior art for the 503 patent. No evidence whatsoever was submitted by Clark at trial to show how the White patent, alone or in combination with any other patents, might be relied upon as prior art.

The District Court held that the Velo loader did not incorporate the claimed features of the 503 patent and was no better prior art than the Loyd patent cited and relied on by the Patent Examiner. It concluded that the relevancy of the White patent, which was at best a possible forerunner of the Velo loader, was limited, because the White patent was more significant to the belt drive of the original Velo loader than to the cam-actuated clutch drive of the 503 patent. We can find no error in the trial court's disposition of this issue.

---

7. In light of these clearly stated conclusions, we consider somewhat less than candid Clark's intimations in its briefs that the trial court found the Velo loader to have been on sale or in public use prior to the statutory bar date.

8. Indeed, Clark does not even acknowledge the existence of this finding, which directly contradicts its contention that the trial court erred by failing to consider the Velo loader as prior art for the 503 patent.

(4) *differences between prior art and claims of the 503 patent*

 *Graham v. John Deere Co.,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), requires that in making an obviousness analysis under § 103, the trial court determine the scope and content of the prior art, ascertain the differences between the prior art and the claims at issue and resolve the level of ordinary skill in the pertinent art. On appeal Clark alleges, in wholly conclusory fashion, that the trial court failed to ascertain the differences between the prior art and the claims of the 503 patent. This contention flies in the face of the trial court's careful examination of the claims of the 503 patent vis-a-vis the Schreck, Hellwarth and Loyd patents, which were the primary prior art patents relied on by the Patent Office, and the Velo loader, which was assumed to be applicable prior art for the purposes of an obviousness analysis. Based on this examination,[9] the trial court concluded:

> Assuming arguendo that the Velo loader is prior art, the deficiencies in that loader were easily recognized by both the Kellers and Velo. The most significant problem involved the heating, and subsequent expanding and slippage of the belts which resulted in the loss of driving and steering control. Installation of clutches was a solution, but there existed a gap in the teaching of the prior art—Hellwarth and Schreck—as to how to install clutches in such a way to be able to actuate them to maintain steering and forward and reverse control in a smooth and effective manner from the operator's compartment. The Kellers conceived a new clutch drive mechanism which proved to be highly effective and commercially successful. The solution by the Kellers was not readily obvious to one having ordinary skill in the pertinent art.

*Clark Equipment Co. v. Keller, supra,* slip op. at 28. We believe that the trial court complied with the requirements of *Graham v. John Deere Co., supra,* by ascertaining the differences between the prior art and the claims of the 503 patent.

(5) *synergistic effect of claimed transmission system*

 Clark argues that because the 503 patent is simply a combination of old elements, the trial court had an obligation to determine whether this combination acted to produce a synergistic or unexpected effect. Clark's allegation of error is based upon two premises, *viz* that a synergism analysis was required and that the District Court failed to meet this requirement. Because we find that the District Court did in fact give adequate consideration to the effect of the combination of elements in the 503 patent, we need not address the question of whether or not a synergism analysis was mandatory on the facts here. In passing, we do note, however major differences between the basicness and simplicity of the old elements combined in the cases cited as controlling by Clark and the more complex elements of the 503 patent.[10] Moreover, it

---

**9.** We consider that a repetition of the detailed findings underlying the differences ascertained by the district judge would serve no useful purpose here. In order, however, to give some indication of the careful and painstaking character of his analysis of the prior art, we will set forth a mere part of his findings on the Schreck patent. The District Court found, *inter alia,* that the Schreck patent disclosed "a self-propelled dolly which is controlled by an operator walking in front of the dolly. As disclosed by the drawings of the Schreck patent, steering and driving control is achieved through a draft tongue 6 having a rotatable gripping handle 61. A linkage bar 63 connected to handle 61 serves to move a link bar for actuation of a pair of clutch units * * * through crank arms * * connected to the opposite ends of link 51."

*Clark Equipment Co. v. Keller, supra,* slip op. at 17. We note that the findings which we have just cited represent a mere fraction of the District Court's exhaustive analysis of the prior art.

**10.** *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976), involved an invention for the cleaning of dairy barns by means of flushing water down an inclined surface. In *Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969), the invention consisted of hanging a radiant burner on the side of a paving machine. The invention involved in *Great Atlantic & Pacific Tea Co. v. Super-*

appears that hindsight alone persuaded Clark of the necessity for a synergism analysis, for Clark first made mention of this issue only in a post-trial reply brief, after failing to raise any synergism claim at or before trial.

The District Court's memorandum opinion does not contain an explicit analysis of synergism. In light of Clark's failure to raise a synergism argument prior to or during trial, we find this lack of explicit reference by the District Court unsurprising. In the patent law context, "synergism" has no talismanic power; synergism is merely one indication of nonobviousness. What is required, when a synergism analysis is appropriate, is simply a determination that the combination of elements in a patent produces "an effect greater than the sum of the several effects taken separately." *Anderson's-Black Rock, Inc., v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 308, 24 L.Ed.2d 258 (1969). A careful reading of the District Court's opinion reveals that determinations of the novelty and unexpectedness of the combinative effect of the elements of the 503 patent underlie the District Court's entire analysis of obviousness under § 103. Form would triumph over substance were we to hold this analysis inadequate for lack of specific reference to synergism, particularly in view of Clark's failure to place the issue of synergistic effect into issue prior to or during trial.

### (6) *obviousness of the 503 patent*

■ Nonobviousness is one condition of patent validity; the subject matter sought to be patented must not be obvious to a person having ordinary skill in the pertinent art. 35 U.S.C. § 103. While the question of obviousness vel non is, like the ultimate question of patent validity, a matter of law rather than fact, *Flour City Architectural Metals v. Alpana Aluminum Products, Inc.,* 454 F.2d 98, 106 (8th Cir. 1972), the obviousness condition imposed by § 103 is one which "lends itself to several basic factual inquiries." *Graham v. John Deere Co., supra* 383 U.S. at 17, 86 S.Ct. at 694.

The basic factual inquiries required under § 103 include a determination of the scope and content of the prior art, an ascertainment of the differences between the prior art and the claims at issue and a resolution of the level of ordinary skill in the pertinent art. *Graham v. John Deere Co., supra* at 17, 86 S.Ct. 684. The District Court made the factual findings required by *Graham v. John Deere Co.,* and nothing Clark has urged on appeal convinces us that these findings are incorrect or lack support in the record.

■ The court held that the 503 patent met the nonobviousness requirement of § 103. Clark raises two primary challenges to this conclusion of nonobviousness: first, that the 503 patent constitutes only an obvious improvement over the Velo loader combined with the Schreck and Hellwarth patents and, secondly, that the 503 patent constitutes only an obvious improvement over the White patent combined with the Schreck and Hellwarth patents. We conclude that the District Court was correct in its determination of the relevant prior art and in its rejection of Clark's contentions that the 503 patent was obvious in light of the original Velo loader taken in combination with the Loyd, Schreck, Hellwarth and White patents.

■ Assuming *arguendo* that the Velo loader was prior art, the District Court found that it did not contain the claims unique to the 503 patent and that it was no better prior art than the Loyd patent cited and relied upon by the Patent Examiner. The court also found that the White patent was more relevant as prior art to the belt-driven Velo loader than to the 503 patent and that the most pertinent prior art consisted of the Schreck and Hellwarth patents, which were cited, considered and rejected by the Patent Office. On this basis, the court concluded that Clark had failed to prove by substantial evidence how the prior art could be combined to meet the claimed structure of the 503 patent without hind-

*market Equipment Corp.,* 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), was nothing more

than a U-shaped frame capable of sliding items along a counter top.

sight.[11] We have previously rejected Clark's piecemeal attacks made on the basis of the trial court's obviousness determination. A careful review of the record convinces us that the District Court's conclusion that the 503 patent constitutes more than a merely obvious improvement over the relevant prior art is entirely correct.

### (7) *candor to the Patent Office*

█ Clark contends that the Kellers' failure to disclose the Velo loader as prior art to the Patent Office constituted a lack of candor that necessitates invalidation of the 503 patent. A patent applicant has an uncompromising duty toward the Patent Office to disclose all pertinent facts. However, a party seeking to establish fraud on the Patent Office because of a failure of full disclosure bears a heavy burden of persuasion: fraud on the Patent Office must be proved by clear, convincing and substantial evidence. *Norton v. Curtiss,* 433 F.2d 779, 797, 57 C.C.P.A. 1384 (1970).

The trial court rejected Clark's contention that the Kellers' nondisclosure of the Velo loader to the Patent Office constituted a breach of the duty of full disclosure. The court held that because there is no duty on a patent applicant to disclose prior use where there is a bona fide basis for believing the use was experimental, the Kellers had no duty to disclose the experimental Velo loader. Moreover, even assuming the Velo loader to be prior art, the court had previously found that it was nonanticipatory. Thus, the Velo loader was of such a nature that even if it had been disclosed to the Patent Office, it would not have had an impact on the issuance of the patent. *Tate Engineering, Inc. v. United States,* 477 F.2d 1336, 1345, 201 Ct.Cl. 711 (1973). Accordingly, nondisclosure of the Velo loader did not constitute a breach of the duty of disclosure.

We have previously expressed our agreement with the trial court's findings that the Velo loader was experimental or, if considered prior art, was nonanticipatory of the 503 patent. These findings support the conclusion that the Kellers breached no duty of disclosure to the Patent Office. At trial, Clark failed to prove a breach of the duty of uncompromising disclosure to the Patent Office; on appeal, Clark has failed to demonstrate that the trial court erred in rejecting its unproved allegation of fraud.

### 117 patent

█ In May 1959, the Kellers and Melroe Manufacturing Company (Melroe) entered into an agreement whereby Melroe acquired an exclusive license under the 503 patent. In 1959 and 1960, Melroe manufactured and sold several loader models, the M–60, M–200 and M–400, all of which were equipped with the transmission drive system covered by the 503 patent.[12] These loaders did not prove to be especially profitable, and Melroe contemplated leaving the loader market. Louis Keller insisted that Melroe try to experiment with new loaders and, due at least partially to his insistence, Melroe decided to experiment rather than abandon the loader field. During the course of this experimentation in 1961, four prototypical preproduction loaders, designated M–440's, were built and the machine incorporating the elements of the 117 patent was developed. Because the 18 claims of the 117 patent, entitled "tractor vehicle and drive therefor", were reduced to practice during the development of the four M–440 prototypes, the individual histories of these machines bear consideration. Application for the 117 patent was filed on October 23, 1962, thus making October 23, 1961, the critical statutory bar date. A

---

11. A patent which has survived the scrutiny of the Patent Office is presumed to be valid, and one attacking validity on the basis of obviousness carries the burden of proof on this issue. *Woodstream Corp. v. Herter's, Inc.,* 446 F.2d 1143, 1149 (8th Cir. 1971).

12. The patent claims of the 503 patent were originally applied to a three-wheel vehicle with two independently rotatable forward driving wheels and a third free-castering rear wheel. By December 1960, the M–200 loader had been modified by the addition of a rear axle and two rear drive wheels, thus producing a four-wheel power driven skid steer loader.

mechanical patent of 17 years' duration was granted to Louis Keller and Clifford Melroe on January 15, 1966.

The first preproduction machine, known as the Clyde Olson loader, was finished no later than the end of February 1961. Although it differed somewhat from earlier models, it was equipped with slide cam type clutch actuators identical to those employed in its predecessors. The Clyde Olson loader, which contained few, if any, elements of the 18 claims of the 117 patent, was never put into production.

Between the date of completion of the Clyde Olson machine and May 1961, a second prototype was constructed. This loader, known as the Gravel Pit loader, was tested extensively by Louis Keller and employees of Melroe in a gravel pit near Gwinner, North Dakota, as well as at the home of Cyril Keller in Rothsay, Minnesota. The Gravel Pit loader differed from the Clyde Olson machine in several major aspects, but not in clutch design. It contained cam type clutch actuators and did not embody all of the elements of the 117 patent.

A third prototype was completed sometime after July 4, 1961, and probably before August 1, 1961. This prototype contained improvements on some of the weaknesses revealed during the gravel pit testing of the third prototype. This testing had made it clear to Louis Keller that there were serious limitations to the tapered clutch design. In particular, the slide cam actuators tended to stick, which would cause the machine to cant or jerk unexpectedly, in a manner dangerous to the operator. Furthermore, the clutches would oil can [13] and the side plates bow, causing the clutches to slip. Nevertheless, the third prototype retained the cam type clutch actuators characteristic of its predecessors and, thus, did not reduce to practice the essential elements of the 18 claims of the 117 patent.

Louis Keller and Clifford Melroe subsequently conceived of and developed a threaded rotary actuator clutch, designed to avoid the aforesaid problems experienced with the slide cam type clutch. This threaded rotary actuator clutch was placed into the fourth prototype, a white loader with flat clutch plates known as the Cy Keller demo. Because of the flat clutch plates, there was difficulty in obtaining good clutch power transmission. The clutches tended to slip and could not be solidly engaged. Bench tests revealed that these problems were caused by the oil canning of the flat clutch plates. A new dome-shaped clutch plate was subsequently designed to avoid the oil canning problem. To provide for lubrication of the clutch linings, the design was also changed to provide oil pickup slots on the input clutch, intended to pick up oil thrown about inside the gear case by the chains.

After a period of testing, the decision was made to produce a new loader line, which was given the same M–440 designation that had been used for its prototypes. The M–440, which was to be white, a color considered appealing to the fertilizer industry, was equipped with a threaded rotary actuator clutch design. Production on the M–440, for which the trade name "Bobcat" was adopted, began in December 1961. The fourth prototype was built to check out the final production tooling for the M–440. It was the first machine to incorporate all of the elements of the threaded clutch actuator eventually put into the M–440. It also represented the first embodiment of all of the elements of the 18 claims of the 117 patent and, accordingly, the date of its construction is crucial. Unfortunately, the large amount of evidence submitted to date the construction of the fourth prototype is contradictory. After carefully analyzing all of the evidence on this point, the trial court found that the most credible evidence established that the date of construction had been near the end of the third quarter of 1961. The critical statutory bar date under 35 U.S.C. § 102(b) is October 23, 1961.

Melroe engaged in commercial promotion of the M–440 before actual production of

---

13. Oil canning occurs when pressure applied to a clutch plate causes flexion similar to that occasioned by the application of pressure to the center of the bottom of a round oil can.

the new loader line began,[14] and in some instances negotiations for sales also preceded production. In retrospect, the rapidity with which the M–440 began to sell may be viewed as an early and accurate indicator of the remarkable commercial success which this loader line has enjoyed. On the other hand, however, the early fruition of the M–440 sales campaign has redounded to the detriment of the holders of the 117 patent. The M–440 loader was offered for sale to both Farmers Union Central Exchange and Midland Cooperatives prior to October 23, 1961, and orders for future delivery were taken from those two companies prior to October 23, 1961. On this basis, that a machine incorporating the elements of the 117 patent had been on sale prior to the statutory bar date of § 102(b), the District Court held the 117 patent invalid. This invalidity under § 102(b) was the sole ground for the holding that the 117 patent was invalid; all other alleged bases for invalidity were considered and rejected by the District Court.

The District Court's ruling that the 117 patent was invalid under § 102(b) is challenged on appeal by the Kellers. Moreover, Clark, which acquired Melroe in 1969 and succeeded to its rights under the license agreement with the Kellers, attacks the District Court's rejection of the additional and alternative grounds of invalidity it has proposed. We will first address the contentions raised by the Kellers and then turn to the more numerous contentions of Clark.

(1) *offer for sale of machine embodying all elements of the 117 patent prior to the statutory bar date*

The Kellers present a tripartite challenge to the District Court's holding that a machine incorporating the elements of the 117 patent was on sale prior to October 23, 1961, the statutory bar date for that patent under 35 U.S.C. § 102(b). They argue that this conclusion is not supported by the evidence; that it is not supported by the trial court's findings; and that it is predicated upon a misconception and misapplication of *Dart Industries, Inc. v. E. I. Du Pont De Nemours & Co.,* 489 F.2d 1359 (7th Cir. 1973), *cert. denied,* 417 U.S. 933, 94 S.Ct. 2645, 41 L.Ed.2d 236 (1974).

The parties introduced a vast amount of evidence on the 117 patent. The complex and often contradictory nature of this evidence is reflected in the trial court's lengthy memorandum opinion, which contains 151 findings of fact relative to the 117 patent alone. In contending that the trial court's holding, that there were invalidating sales of a machine incorporating the elements of the 117 patent, is not supported by the evidence, the Kellers point out that Clark bore the burden of proof, *Woodstream Corp. v. Herter's, Inc.,* 446 F.2d 1143, 1149 (8th Cir. 1971); they denigrate the adequacy of almost every piece of evidence relied upon by the District Court and point to evidence which, they contend, should have been relied upon instead.

We have reviewed the record in light of each of the Kellers' specific allegations of lack of evidentiary support. This review convinces us that the trial judge made an exhaustive analysis of the mountainous evidence submitted on the 117 patent and that his conclusion that a machine incorporating all the elements of the 117 patent was offered for sale prior to October 23, 1961, is adequately supported by the evidence. It would serve no useful purpose to recite and refute each separate allegation of eviden-

14. There was conflicting testimony as to whether a white Melroe loader was exhibited at the Minnesota State Fair between August 26 and September 4, 1961. The trial judge deemed this evidence inconclusive and insufficient to support a finding that a white Melroe loader was on display at the Fair. He concluded that "Melroe intended to display a 440 loader at the Fair, but for some reason did not."

There was also evidence showing that a news release advertising the M–440 Bobcat was distributed to a large number of trade publications and newspapers within a few days of the critical bar date of October 23, 1961. The news release was dated October 20, and a newspaper article published October 26 contained an almost verbatim recitation of the contents of the news release. There was, however, no direct evidence of the date on which the release was mailed.

tiary insufficiency urged by the Kellers; the record, which we have read with care, contains more than adequate evidence to support the District Court's conclusion that "the 440 loader was offered for sale to Farmers Union Central Exchange and Midland Cooperatives prior to the October 23, 1961, § 102(b) statutory bar date, and that orders for future delivery were taken from those two companies prior to October 23, 1961." We deem it sufficient here simply to point out some of the more salient evidence supportive of this conclusion.

Melroe actively promoted the M–440 Bobcat not only prior to the commencement of production in December 1961, but at some time extremely near the statutory bar date. While this evidence alone is insufficient to establish that the M–440 was offered for sale prior to October 23, it is available to buttress the circumstantial evidence of sales activity found in the record. Insofar as the sales involving Farmers Union Central Exchange (Farmers Union) are concerned, a partial list of the evidence includes: Melroe's demonstration of a white loader to representatives of Farmers Union some time prior to October 4, 1961; a Melroe purchase order dated October 3, 1961, for three M–440 loaders with fertilizer buckets at $2,750 each; a Farmers Union purchase order dated October 4, 1961, for three M–440 loaders with fertilizer buckets at $2,750 each; a Melroe invoice with an acknowledgment date of October 4, 1961, for three M–440 loaders with fertilizer scoops at $2,750 each; and a bill of lading showing delivery of one 440 S.P. loader with fertilizer scoop to Farmers Union on January 4, 1962. The authenticity of these documents was established at trial. Moreover, the Kellers submitted no evidence rebutting or explaining these documents. Accordingly, the trial court chose to infer that the M–440 loader was offered for sale to Farmers Union prior to October 23, 1961. In our review of the record, we have examined the documentary and other evidence underlying this inference and are convinced that the trial court's inference and conclusion are fully supported by the record.

Insofar as the sales involving Midland Cooperatives are concerned, a partial list of the evidence contained in the record includes: a Melroe purchase order dated September 23, 1961, for nine M–440 loaders with fertilizer buckets for future delivery to different locations; and seven Melroe invoices, each of which bears an acknowledgment date of September 30, 1961, covering the sale of seven M–440 loaders with fertilizer scoops to Midland Cooperatives for delivery to different locations. The trial court considered this evidence in light of the testimony of former employees of Midland Cooperatives and Melroe on the procedures followed by Melroe in processing orders, and made the inference that the sales involved were processed prior to September 30, 1961. Our own review of these documents and the record as a whole convinces us that the trial court's inference was reasonable[15] and that its conclusion

---

15. The Kellers argue that Clark was not entitled to inferences that offers of sale were made prior to the critical date. In its memorandum opinion, the trial court clearly explained that its inferences of sales activity were based upon specific sale documents. In an action tried without a jury, inferences drawn from documents or undisputed facts shall not be set aside unless they are clearly erroneous. *United States v. U. S. Gypsum Co.,* 333 U.S. 364, 394, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *Birdwell v. Hazelwood School Dist.,* 491 F.2d 490, 494 (8th Cir. 1974). Moreover, when conflicting inferences may be drawn from the evidence, a reviewing court is not at liberty to disturb a reasonable inference made by the trial court unless it is definitely and firmly convinced that a mistake has been made. *A. L. B. Theatre Corp. v. Loew's Inc.,* 355 F.2d 495 (7th Cir. 1966). Finally, on appeal the evidence, including the inferences reasonably drawn therefrom, must be viewed in the light most favorable to the prevailing party. *Imperial Cas. & Indem. Co. v. Carolina Cas. Ins. Co.,* 402 F.2d 41, 44 (8th Cir. 1968). We have reviewed the trial court's inferences of sales activity prior to October 23, 1961; we find them to be reasonable and not clearly erroneous.

In challenging the inferences drawn by the trial court, the Kellers also argue that because of certain past behavior, Clark was not entitled to beneficial inferences from the evidence. After a careful analysis of Clark's past behavior, in particular, its failure to preserve evidence or records in its possession possibly relating to this issue, the District Court, "with some hesi-

that the M–440 loader was offered for sale to Midland Cooperatives prior to October 23, 1961, is supported by the evidence.

The Kellers also argue that "the trial court's conclusion that a machine having all the patented features of the 117 patent was offered for sale prior to the critical date is not supported by the trial court's findings." In support of this contention, the Kellers refer specifically to only two of the trial court's 151 findings of fact on the 117 patent, which they characterize as inconclusive. Notably, they do not argue that these or any other findings of fact are clearly erroneous. We can find no merit in this contention. The trial judge's findings of fact support his conclusion and have not been shown to be clearly erroneous.

A patent is invalid under 35 U.S.C. § 102(b) if the subject matter of the invention has been on sale or in public use more than one year prior to the filing of the patent application. The District Court held that a machine embodying the elements of the 117 patent had been on sale prior to the statutory bar date. In discussing its conclusion that the § 102(b) bar applied, the District Court stated:

> It is not necessary that the "patented product" be on hand in commercial quantities for it to be "on sale" within the meaning of § 102(b). In fact, it is only necessary the invention be "essentially" completed at the time of the invalidating sale. Exact identity between the product sold and the product described in the patent application is not required. *Dart Industries, Inc. v. E. I. Du Pont De Nemours and Co.,* 489 F.2d 1359, 1364–65 (7th Cir. 1973), *cert. denied,* 417 U.S. 933 [94 S.Ct. 2645, 41 L.Ed.2d 236] (1974).

*Clark Equipment Co. v. Keller, supra,* slip op. at 56. The Kellers contend that the District Court's conclusion is incorrect because it is based upon a misapplication of *Dart Industries, supra.* The crux of this contention appears to be that the District

Court relied upon *Dart Industries* to avoid the identity requirement of § 102(b). We are unable to agree.

It is undisputed that the M–440 included all of the features of all of the claims of the 117 patent. The final prototype preceding production of the M–440 was the fourth prototype, which contained all of the elements of the threaded rotary clutch actuator concept. The trial court found that the fourth prototype was constructed during the third quarter of 1961, that is, prior to October 23. M–440 loaders were offered for sale to both Farmers Union and Midland Cooperatives prior to October 23. This evidence fully supports the District Court's conclusion that a machine embodying all of the elements of the 117 patent was on sale prior to the statutory bar date. We can find no legal error in this conclusion. The identity requirement of § 102(b) was met, and *Dart Industries,* which is merely interpretive of § 102(b), was not misapplied.

### (2) *standard of proof*

■ Under 35 U.S.C. § 282, a patent which has survived the scrutiny of the Patent Office carries a presumption of validity, and a party objecting to the validity of a patent bears the burden of establishing invalidity. *Woodstream Corp. v. Herter's, Inc.,* 446 F.2d 1143, 1149 (8th Cir. 1971). The District Court required Clark to adduce substantial evidence of patent invalidity to rebut the presumption of validity. The Kellers contend that substantial evidence is an improper and overly lenient standard of proof. They argue that the District Court should have required Clark to establish patent invalidity by clear and convincing evidence and that Clark did not adduce clear and convincing evidence of invalidity and, therefore, failed to meet the appropriate standard of proof.

Although courts have differed over the precise quantum of proof necessary to overcome the presumption of patent validity,

---

tation," gave Clark the benefit of inferences of sales activity. The Kellers have cited no authority which suggest that the District Court erred in deciding to draw inferences favorable

to Clark. The record supports the inferences drawn by the District Court and we can find no error in the decision to draw inferences favorable to Clark.

*Woodstream Corp. v. Herter's, Inc., supra* at 1149 n. 4, there is general agreement that the burden is a heavy one. In recent years, several circuits have defined the burden of establishing patent invalidity as one which must be satisfied by clear and convincing evidence.[16] This circuit, however, has defined the standard of proof in terms of substantial evidence. *Woodstream Corp. v. Herter's, Inc., supra* at 1149 n. 4; *L & A Products, Inc. v. Britt Tech Corp.,* 365 F.2d 83, 86 (8th Cir. 1966).

In requiring Clark to present substantial evidence in order to establish patent invalidity, the District Court was simply requiring the quantum of proof used in this circuit in patent cases. We cannot say that the District Court erred by imposing the standard of proof current in this circuit rather than substituting a standard used elsewhere. Applying the substantial evidence standard, the District Court deemed Clark's evidence of sales activities prior to the statutory bar date to be sufficient to establish the invalidity of the 117 patent under 35 U.S.C. § 102(b). As we have previously indicated, we find this conclusion to be amply supported both by the evidence and the trial court's findings. Moreover, it was based upon a correct interpretation of the controlling law, including the standard of proof.[17]

*Clark's alternative contentions on the invalidity of the 117 patent*

▮▮▮ Clark convinced the District Court that the 117 patent was invalid under § 102(b) because of sales activity prior to October 23, 1961, the statutory bar date. Clark also challenged the validity of the 117 patent on the ground that it was obvious and did not, therefore, conform to the requirement of nonobviousness imposed by 35 U.S.C. § 103.[18] Under the guidelines of *Graham v. John Deere Co., supra,* the District Court made an exhaustive analysis of the obviousness issue and ultimately concluded that the 18 claims of the 117 patent were nonobvious within the meaning of 35 U.S.C. § 103. Clark now challenges this determination and raises various miscellaneous claims of error. We will first address these miscellaneous contentions, which derive in large part from the trial court's § 102(b) analysis discussed above.

(1) *demonstration at the Minnesota State Fair*

There was conflicting testimony on the question of whether a white Melroe loader was demonstrated at the Minnesota State Fair between August 26 and September 4, 1961. The trial judge considered this evidence to be inconclusive and insufficient to support a finding that a Melroe loader was on display at the Fair. He found that Melroe had intended to display a loader at the Fair, but that it had not done so. Clark characterizes this finding as clearly erroneous and, in support of this characterization, cites the evidence favorable to a finding that a loader was on display.

Upon a review of the evidence submitted on this point, we are in full agreement with the trial judge's assessment that the record contained insufficient evidence to establish

---

**16.** *See, e. g., Aluminum Co. of America v. Amerola Products Corp.,* 552 F.2d 1020, 1024 (3d Cir. 1977); *Chicago Rawhide Mfg. Co. v. Crane Packing Co.,* 523 F.2d 452, 458 (5th Cir. 1975), *cert. denied,* 423 U.S. 1091, 96 S.Ct. 887, 47 L.Ed.2d 103 (1976); *Minnesota Mining & Mfg. Co. v. Kent Indus., Inc.,* 409 F.2d 99, 100 (6th Cir. 1969).

**17.** Clear and convincing evidence and substantial evidence are not standards which lend themselves to precise definition or quantification and we will not attempt to identify and quantify any degree of variance which may distinguish them. We simply note that both are heavy burdens of proof and though there is

a difference in the standards, we have no doubt that the proof which was considered adequate under the substantial evidence standard here would also suffice under the clear and convincing evidence test.

**18.** Although the invalidity issue was decided in Clark's favor, the issue of nonobviousness remains live in regard to the Kellers' claim for negligence against Clark and its predecessor, Melroe, for failure to make a timely application for the 117 patent and in regard to Clark's third-party claim against the law firm of Williamson, Bains and Moore. These claims remain with the District Court for resolution.

that a loader was displayed at the Fair. We consider his finding of non-display eminently correct. Moreover, even if we assume this finding to be erroneous, we are unable to discern how Clark could have been prejudiced thereby. The trial court ruled in favor of Clark by holding the 117 patent invalid under § 102(b) on the basis of sales activity prior to the statutory bar date. A finding that a Melroe loader was on display at the Fair would simply have provided cumulative evidence of this invalidating activity.

(2) *exclusion of two Midland Cooperatives purchase orders*

One of the bases for the trial court's conclusion that the 117 patent was invalid under § 102(b) was the finding that the M–440 loaders had been offered for sale to Midland Cooperatives prior to the statutory bar date. Two documents offered by Clark to prove sales activity with Midland Cooperatives were excluded from evidence for lack of adequate foundation showing them to be business records prepared in the normal course of business. Clark contends that this exclusion was erroneous and that it reveals that the trial court imposed abnormally stringent evidentiary requirements upon Clark.

We can find no error in this exclusion. Moreover, we are unable to discern that this ruling had any prejudicial effect whatsoever upon Clark, which prevailed upon the very issue to which these excluded documents were directed. Finally, the record is devoid of support for the contention that in this or any other evidentiary ruling, improper evidentiary requirements were imposed upon either party.

(3) *exclusion of interrogatories and answers from Universal lawsuit*

Clark attempted to introduce into evidence an exhibit containing discovery material from the lawsuit against Universal which had been settled by Clark's predecessor Melroe by way of a sublicense agreement with Universal. This exhibit consisted of interrogatories directed to representatives of Melroe and to the Kellers, and their answers thereto. In opposition to the introduction of this exhibit, the Kellers asserted that the Universal lawsuit had been controlled by Melroe's attorney; they testified that although they had signed the interrogatory answers under oath, they were never given or shown copies of the questions to which these answers pertained. The District Court excluded this exhibit from evidence, but permitted Clark to use the interrogatories and answers on cross-examination of the Kellers for impeachment purposes. Clark contends that this limitation was erroneous.

We need not decide whether this exclusion was erroneous, for we are convinced that if it was error, it was harmless. Clark engaged in extensive cross-examination of the Kellers, during which it was allowed to use the interrogatories and answers for impeachment. Moreover, Clark was successful in obtaining a ruling of invalidity on the 117 patent, to which this proffered exhibit apparently pertained. Under these circumstances, we do not believe that Clark has asserted, nor does our review of the record show, any prejudice flowing from the exclusion of this exhibit from the evidence.

(4) *obviousness of the 117 patent*

At trial, Clark challenged the 117 patent not only on the basis of invalidating activity under 35 U.S.C. § 102(b), but also on the basis of obviousness as that term is defined by 35 U.S.C. § 103. We have already expressed our agreement with the District Court's determination that the 117 patent was rendered invalid by sales activity prior to the statutory bar date imposed by 35 U.S.C. § 102(b). Clark argues that the District Court erred in not finding the 117 patent invalid on the additional ground of obviousness under § 103 and asks that we remedy this purported error. Clark attacks the District Court's ruling that the 117 patent was nonobvious on three grounds. It alleges that the District Court failed to determine the scope and content of the prior art; that it failed to ascertain the

differences between the prior art and the claims of the 117 patent; and that it erred in failing to find the subject matter of the 117 patent to be an obvious improvement over the prior art.

A perusal of these alleged errors could easily create the impression that the District Court chose not to consider the obviousness of the 117 patent because of its conclusion that this patent was invalid on other grounds. Nothing, however, could be farther from the truth. While Clark conceded that the 117 patent was nonobvious on the basis of the prior art cited to the Patent Office, it asserted that there was "pertinent prior non-cited art" upon which the 117 patent was merely an obvious improvement. The detailed consideration given by the District Court to this allegedly pertinent non-cited prior art, which included pre-production loaders used as demonstrators, the M–400 loader and a number of patents, is reflected in 23 findings of fact and a lengthy legal analysis. Adhering to the guidelines of *Graham v. John Deere Co., supra,* the District Court determined the scope and content of the prior art asserted by Clark, ascertained the differences between this prior art and the claims of the 117 patent and determined the level of ordinary skill in the small loader art. The District Court found that Clark had failed to show how the non-cited art was more pertinent than the prior art cited by the Patent Office. In view of Clark's admission that, based solely on the cited art, the Patent Office was correct in allowing the 117 patent, the District Court concluded that Clark had failed to prove that the 117 patent was invalid under 35 U.S.C. § 103.

We have carefully considered each of Clark's attacks on the District Court's obviousness analysis of the 117 patent and find

merit in none of them. The District Court made the findings of fact required by *Graham v. John Deere Co., supra,* and nothing Clark has urged on appeal convinces us that these finding are not correct and fully supported by the record. Moreover, the District Court's conclusion of nonobviousness reflects both a praiseworthy understanding and proper application of the controlling law.

(5) *indefiniteness of 117 patent*

Under 35 U.S.C. § 111, a patent application must include a specification of the patent. The requirements of this specification are set forth, as follows, in 35 U.S.C. § 112:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains * * * to make and use the same * * *.

Clark contends that the omission from the specification for the 117 patent of any mention of the weight distribution of the wheels of the loader rendered the 117 patent application deficient under § 112. When the vehicle described by the 117 patent is fully loaded, 70% of the weight is on the two front wheels and 30% on the two rear wheels. The opposite is true in an unloaded condition: 70% of the weight is on the rear wheels and 30% on the front wheels.

There is some dispute as to who introduced the weight distribution issue at trial and what significance was attributed to it by the District Court.[19] In any event, the District Court's brief discussion of the weight distribution of the patented loader occurred in its analysis of the obviousness of the 117 patent.[20] In response to Clark's

---

**19.** Clark alleges that at trial, the Kellers "for the first time in the history of this patent, asserted that the key element in the 117 patent was the fact that there was a 70%-30% weight distribution on the wheels of the loader depending on whether the vehicle was fully loaded or unloaded." Clark also alleges that this weight distribution was labeled by the trial court as a critical element of the 117 patent.

The Kellers respond that they have never asserted that the 70%-30% weight distribution is a key element and that Clark is attempting to mislead this court by stating that the trial court labeled the 70%-30% weight distribution as a critical element of the 117 patent.

**20.** In its obviousness analysis, the District Court found the 70%-30% weight distribution

allegation that the 117 patent was merely an obvious improvement over the M–400, the weight distribution of the patented loader was discussed. This aspect of the loader was hardly a surprise to Clark, which had touted the 70%-30% weight distribution in its own promotional literature. Nevertheless, Clark, which was also familiar with the patent application and thus aware that it did not mention the 70%-30% weight distribution, chose not to attack the 117 patent at trial on the basis of an inadequate specification under § 112. It now voices this challenge to the 117 patent for the first time on appeal. Under the circumstances, we are hardly predisposed to excuse Clark's failure to raise this contention at trial, especially in light of the fact that Clark has already succeeded in invalidating the 117 patent on other grounds. Nevertheless, because this contention lends itself to summary disposition, we will consider it now.

The District Court found that although the 70%-30% weight distribution is not expressly stated in the specification of the 117 patent, the features set forth in claims 10–15 and 18 do recite the structural features which provide this inherent condition. Thus, the weight distribution of the patented loader is inherent in the structural features recited in claims 10–15 and 18. A patent specification must be expressed in terms that will enable a person skilled in

the art to which it pertains to make or use the invention. Were a person skilled in the loader art to construct a loader as described in the specification of the 117 patent with materials normally used for such construction, so as to include the elements of claims 10–15 and 18, the resulting structure would possess the 70%–30% weight distribution. Thus, the specification for the 117 patent is not deficient under § 112.

### 254 patent

On July 25, 1962, Louis Keller, Cyril Keller and Clifford Melroe applied for a patent on "the ornamental design for a self-propelled loader." This patent, the 254 patent, was issued on May 21, 1963; [21] it is a design patent covering the machine mechanically patented in the 117 patent.[22] The District Court sustained the validity of the 254 patent.

On appeal, Clark has presented numerous arguments in favor of reversing the District Court's holding that the 254 patent is valid. Because we conclude that the 254 patent did not comport with the novelty requirement of 35 U.S.C. § 171, we believe that a recitation and discussion of Clark's remaining allegations of error would be superfluous. Suffice it to say that we have scrutinized each of these other allegations of error and find them to be without merit.[23]

---

to be a functional advantage inherent in the structure defined in claims 10–15 and 18 of the 117 patent and absent in the M–400. The patent specification recites the structural features which provide this functional advantage and we do not consider that the patent application was defective under § 112 for failure to describe this inherent functional advantage. Under these circumstances, it was proper for the District Court to consider the weight distribution of the patented loader in determining the obviousness of the patent.

21. The record is somewhat unclear as to the duration of this design patent. Counsel for Clark stated at oral argument that the 254 patent had been issued for a fourteen-year period. Based on that figure, the 254 patent would have expired on May 21, 1977.

22. The history of the development of the machine which underlies both the 117 mechanical patent and the 254 design patent has been set forth at length in our analysis of the 117 patent and will not be repeated here.

23. We note that our determination that the 254 patent is not novel, when considered in light of the M–400 loader, does not vitiate the trial court's conclusion that the Kellers acted in good faith in the prosecution of the 254 design patent. Even if the M–400 is assumed to be better prior art than the 506 patent, which was considered by the Patent Office, we do not believe that Clark has shown that the Kellers' nondisclosure of the M–400 constituted an act of wilful bad faith manifesting an intent to mislead the Patent Office. The Kellers apparently considered the M–400 nothing more than a hybrid version of the earlier Melroe loaders covered by the 506 design patent, which was cited as prior art. Although we disagree with their appraisal of the M–400, the record does not provide support for the conclusion that their decision not to disclose the M–400 to the Patent Office was motivated by bad faith. Clark has not proved by clear, convincing and substantial evidence that the Kellers failed to act in good faith in the prosecution of the 254 patent.

35 U.S.C. § 171 provides that a person who invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, so long as the other conditions and requirements of Title 35 have been met. It follows, under an integration of the various requirements for patentability set forth in Title 35, that in order to be valid, a design patent must be new, original, ornamental, nonobvious and the result of invention. In determining the validity of a design patent, it is the appearance of the article taken as a whole which must meet the statutory requirements, for "the thing invented or produced, for which a patent is given, is that which gives a peculiar or distinctive appearance to the manufacture, or article to which it may be applied * * *." *Gorham Co. v. White,* 81 U.S. (14 Wall.) 511, 525, 20 L.Ed. 731 (1871). *Schnadig Corp. v. Gaines Manufacturing Co., Inc.,* 494 F.2d 383, 389 (6th Cir. 1974); *Hadco Products, Inc. v. Walter Kidde & Co.,* 462 F.2d 1265, 1269 (3d Cir.), *cert. denied,* 409 U.S. 1023, 93 S.Ct. 464, 34 L.Ed.2d 315 (1972).

The tests by which the appearance of a design patent must be judged vary according to the particular statutory requirement for patentability which is at issue. The obviousness of a design patent is determined by an analysis under the general requirements of 35 U.S.C. § 103, tailored to fit the design situation: the differences between the design patent and the prior art must not be obvious to a designer with ordinary skill in the art. The novelty of a design patent, on the other hand, is tested by determining the impact of the design upon an ordinary observer. A design patent is novel when the "average observer takes the new design for a different, and not a modified already existing design."

*Thabet Manufacturing Co. v. Kool Vent Metal Awning Corp.,* 226 F.2d 207, 212 (6th Cir. 1955). This is the prevailing and now well-settled test for the novelty of a design patent. *See, e. g., Schnadig Corp. v. Gaines Manufacturing Co., Inc., supra* at 389; *Rains v. Cascade Industries, Inc.,* 402 F.2d 241, 247 (3d Cir. 1968); *Hygienic Specialties Co. v. H. G. Salzman, Inc.,* 302 F.2d 614, 617 (2d Cir. 1962); *Application of Bartlett,* 300 F.2d 942, 943, 49 C.C.P.A. 969 (1962).

At trial, Clark contended that the 254 design patent lacked novelty when viewed against the M–400 loader; it argued that the M–400 loader design was so similar in overall configuration to the design of the 254 patent that the ordinary observer could not distinguish them.[24] The District Court made the finding that there was no substantial evidence that an ordinary observer could not readily distinguish between the M–400 and the subsequent Bobcat loader covered by the 254 patent. Clark's novelty challenge to the 254 patent was rejected in the following terse conclusion:

> The test of the "ordinary observer" may be relevant to determine novelty with respect to design; however, there is no substantial evidence in this record that ordinary observers could not readily distinguish between the M–400 and the subsequent BOBCAT loader covered by the 254 patent. The Court refers specifically to the sparse testimony of witnesses Steenhoven and Van Winkle.

*Clark Equipment Co. v. Keller, supra,* slip op. at 79.

Although various pictures and drawings of the M–400 loader and Bobcat loader covered by the 254 patent were introduced at trial, there was little testimony adduced that could be deemed applicable to the issue of the impact of the appearances of these

---

**24.** The sole prior art considered by the Patent Office was the 506 design patent, a patent on the machine mechanically patented by the 503 patent. While the District Court held that the M–400 was no better prior art for the 254 design patent than was the cited 506 patent, it nevertheless proceeded to consider the validity of the 254 patent from the viewpoint that the M–400 was prior art. We will follow the same analytic approach.

loaders on the ordinary observer.[25] While we agree with the District Court that the testimony on the issue of the visual impact of these loaders was "sparse," we are unable to agree either with the finding that the record was devoid of substantial evidence probative of this point or the statement that the ordinary observer test "may" be relevant to a determination of novelty. The impact of the design upon an ordinary observer "may" not be relevant in determining novelty; as we have previously noted, it *is* the test for the novelty of a design patent. Moreover, when this test is applied to the record here, it compels the conclusion that the 254 patent is not novel.

 In emphasizing the minimal quantity of testimony on this issue, the trial court clearly chose to base its conclusion of novelty upon the documentary evidence illustrating the designs of the M–400 and 254 patent. The documents depicting the M–400 and Bobcat loaders are as available to this court as they were to the trial court and it is our prerogative to interpret these exhibits ourselves. *American Infra-Red Radiant Co. v. Lambert Industries, Inc.,* 360 F.2d 977, 988 (8th Cir.) *cert. denied,* 385 U.S. 920, 87 S.Ct. 233, 17 L.Ed.2d 144 (1966). We have reviewed and compared this documentary evidence with care, and we are convinced that the trial court erred in finding that the differences between the M–400 and Bobcat loaders were sufficient to establish the novelty of the 254 patent. The differences between the two designs, cited by the District Court in support of its finding, involve structural details; when the overall visual impact, which is the appropriate reference for design patents, is considered, the

striking similarity of the designs of the M–400 and 254 patent becomes clear. Both are compact four-wheel front-end loaders with boom arms pivoted on supports adjacent to the rear and extending down at a low angle in the front.

 While "we do not say that six eyes are necessarily apt to reach a more accurate assessment than are two," *Frito-Lay, Inc. v. So Good Potato Chip Co.,* 540 F.2d 927, 931 (8th Cir. 1976), our observation of the documentary evidence depicting the designs of the M–400 loader and the 254 patent convinces us that an average observer would not view the design of the 254 patent as anything more than a modification of the M–400.

Accordingly, we conclude that the 254 patent did not meet the requirement of novelty posited by 35 U.S.C. § 171. This is our sole disagreement with the District Court's analysis of the 254 patent and it is on this basis alone that we hold the 254 patent invalid.

The judgment of the District Court on the 503 and 117 patents is affirmed; the judgment on the 254 patent is reversed.

**25.** The testimony of Steenhoven and Van Winkle related to a transaction between the two in which Steenhoven painted an M–400 loader white, the standard color for Bobcat loaders, and sold it to Van Winkle as a used Bobcat. While we would hesitate to consider this transaction definitive evidence that the ordinary observer could not distinguish the M–400 from the 254 design, it can certainly be viewed as providing support for such a conclusion. Moreover, the fact that testimony on this transaction is "sparse" and that the record is not replete with evidence of actual episodes of confusion on the part of ordinary observers hardly detracts from the cogency of the documentary evidence illustrating the similarity of the designs of the two loader models.