Alvin C. BJERKEN et al., Plaintiffs
and Appellants,

v.

AMES SAND AND GRAVEL COMPANY,
Inc., and Schultz & Lindsay Construction
Co., Defendants and Respondents.

Civ. No. 8710.

Supreme Court of North Dakota.

June 22, 1971.

Rehearings Denied Sept. 2, 1971.

Solberg, Anderson & Stewart, Fargo, for plaintiffs and appellants.

Huseby & Backes, Fargo, and Dosland, Dosland & Nordhougen, Moorhead, Minn., for respondent Ames Sand and Gravel Company, Inc.

Lanier & Knox, Fargo, for respondent Schultz & Lindsay Construction Co.

ERICKSTAD, Judge.

The plaintiffs, whom we shall hereinafter refer to as the Bjerkens, appeal from a judgment of the district court of Cass County, dated April 23, 1970, which determined the right of the defendant Schultz & Lindsay Construction Company to enter upon certain premises of the Bjerkens, for the purpose of removing material therefrom in the amount of $46,270.01. Material to be removed from the premises was to be credited to the judgment at the rate of $.20 per cubic yard. Trial de novo is demanded.

The Bjerkens, through their amended complaint of March 11, 1970, assert that on April 5, 1957, they leased certain property for ten years to Ames Sand and Gravel Company, Inc., and Schultz & Lindsay Construction Company, for the purpose of mining gravel.

They further assert that this lease was assigned on February 1, 1958, to Clay County Sand and Gravel Company and that said assignment was reduced to writing in an agreement dated January 1, 1959.

The pertinent allegations of the amended complaint are contained in paragraphs X through XVII thereof:

"X.

"That the lease agreement provides that the lessee shall remove and pay for a minimum of 1,250,000 cubic yards of sand and gravel during the ten year lease period at a price of $.20 per cubic yard for a minimum total payment of $250,-000.00 over the ten year term of the lease.

"XI.

"That a total of $239,339.84 has been paid to plaintiffs by defendant Schultz and Lindsay Construction Company and assignee Clay County Sand & Gravel Co. and that no other payments have been received by plaintiffs. That the sum of $10,660.16 is still due and owing to the plaintiffs in accordance with the minimum payment required by the lease agreement.

"XII.

"That 158,350 cubic yards of overburden were removed by defendants or their

assignee in order to gain access to gravel deposits and that said overburden has been distributed about the premises in uneven and unsightly piles and on top of valuable unopened sand and gravel deposits in violation of the terms of the lease agreement.

## "XIII.

"That plaintiffs are entitled to recover from the defendants, the cost of hauling said overburden to a 'worked out' pit on the premises and leveling and grading the overburden as it is dumped into said 'worked out' pit so as to restore the land, as nearly as possible, to its original condition. That the cost of such hauling and leveling is $20,000.00.

## "XIV.

"That defendants or their assignee, in the process of mining said sand and gravel and processing it for use, separated and removed the coarse rock and aggregate which is the most valuable part thereof, and accumulated a large pile of sand which was rejected by their processing plant. That the volume of said pile of sand is 293,847 cubic yards of which 271,875 cubic yards is piled near an open pit and 21,972 cubic yards has been dumped back into said open pit which is not yet depleted or 'worked out'. That 293,847 cubic yards of sand is equal to 425,000 tons of sand.

## "XV.

"That the large pile of sand rejected from said processing plant covers valuable unopened sand and gravel deposits and contaminates the open pit by mixing the rejected sand with undisturbed deposits in said open pit and that said pile of reject sand must be removed to allow access to the sand and gravel deposits which it covers. That the terms of the lease agreement required that defendants 'remove and pay for a minimum of 1,250,-

000 cubic yards' of material and that they have removed approximately 850,000 cubic yards of choice rock and aggregate and have abandoned the material rejected by their processing plant rather than remove it from the premises as was required by the lease agreement. Therefore, plaintiffs are entitled to recover from the defendants the cost of loading the said reject sand and removing it from the premises or in the alternative, the cost of removing it to a site on the premises which will not be damaged due to the covering of unmined gravel deposits.

## "XVI.

"That defendants failed to remove gravel processing equipment at the termination of the aforementioned lease and that such equipment is now forfeited to B–B Ranch, Inc., because of defendants' failure to remove it within a reasonable time after the expiration of the lease and for the alternative reason that said equipment constitutes a permanent structure and has thereby become a part of the real estate.

## "XVII.

"The defendants' failure to account for all material mined and stockpiled has necessitated the employment of a surveyor to measure the volume of sand and gravel mined and abandoned on the premises. That plaintiffs have paid the expenses of such a survey in the amount of $1,000.00 and are entitled to recover this from the defendants."

The amended complaint concludes with this prayer for relief:

"1. $10,660.16 for the defendants' deficiency in the minimum payment required by the lease agreement.

"2. $20,000.00 for leveling, redistributing and removing improperly placed overburden.

"3. $70,000.00 for loading and hauling the reject sand to a location where un-

mined gravel deposits will not be covered by said sand.

"4. $1,000.00 for cost of measuring the pile of reject sand.

"5. That all structures and equipment presently located on the premises be adjudged and declared forfeited by defendants to plaintiff B–B Ranch, Inc.

"6. For their costs and disbursements of this action and interest from and after the 5th day of April, 1967.

"7. For such other and further relief as the Court may deem just and equitable in the premises."

In its answer, Schultz & Lindsay Construction Company asserts that it has mined only 828,879 cubic yards of material and, hence, that it has overpaid the Bjerkens approximately $73,564.

During the trial of the lawsuit, Schultz & Lindsay Construction Company, whom we shall hereinafter refer to as Schultz & Lindsay Company, conceded that this figure was in error and asserted instead that it had overpaid $69,597.97.

Pertinent parts of the answer and counterclaim read:

"III.

"Specifically denies Paragraph Eight (8) of the Complaint herein and affirmatively alleges that they have only mined 828,879 cubic yards of total materials and hence have overpaid plaintiffs the approximate sum of $73,564.00.

"IV.

"That the defendants did remove some amount of over-burden from gravel deposits, but that all were removed within the normal contemplation of the lease agreement herein; that at all times during the lease, plaintiffs were fully aware of said removal, saw where said overburden was being distributed and at no time made any complaint to the defendants about same.

"V.

"That the defendants did separate a certain amount of reject sand in the course of the mining operations but that all of same was done within the terms of said lease and fully contemplated under the terms of said lease by all parties thereto; that the plaintiffs at all times could see the amount of reject sands, knew where they were being piled or dumped and at no time made any complaint to the defendants; that the cost of removal of such reject sand is greatly exaggerated in the complaint and as a matter of fact, said sand has a definite use and value.

"VI.

"That the defendants did [not] and have not removed certain gravel processing equipment for the simple reason that they are still entitled to the above described thousands of cubic yards of gravel which they have paid for and have not removed; that the period of time for which the lease was to run has expired but that the rights under that lease have not expired.

"VII.

"That the defendants regularly accounted to the plaintiffs for all sand and gravel mined under the terms of said lease and any expenses that the plaintiffs incurred for surveying same is the obligation of the plaintiffs.

"COUNTERCLAIM

"For Counterclaim against the plaintiffs herein, the defendant, Schultz & Lindsay Construction Co., alleges:

"I.

"Incorporates Paragraphs One (1), Two (2), Three (3), Four (4), Five (5), Six (6), Seven (7), and Nine (9) of the Complaint herein as though fully set forth hereunder.

"II.

"That the counterclaimants have at all times performed under the terms of the leases herein; that because of the yearly minimum payment requirements under the terms of the lease, Counterclaimants have actually paid the plaintiffs some $73,564.00 more than the tonnage or cubic yardage that they have mined; that the plaintiffs have not allowed Counterclaimants to remove the amount of tonnage or cubic yardage that they have paid for; that, as a matter of fact, plaintiffs have again leased the premises to the defendant, Ames Sand and Gravel Company, Inc., foreclosing any opportunity to this Counterclaimant to be able to remove said amounts of sand and gravel.

"III.

"That Counterclaimant has approximately $100,000.00 worth of mining equipment on said premises which plaintiffs refuse to allow them to remove."

During the trial of the lawsuit, Schultz & Lindsay Company abandoned Paragraph III of the Counterclaim.

Ames Sand and Gravel Company, Inc., filed an answer which in essence generally denies the allegations of the complaint and asserts that by assignment of February 1, 1958, and agreement dated January 1, 1959, it assigned all of its right, title and interest in the lease, dated April 5, 1957, to Clay County Sand and Gravel Company, which assignment was consented to by the Bjerkens.

It further asserts a cross-claim against Schultz & Lindsay Company for any sum that may be adjudged against it in favor of the Bjerkens.

Before we attempt to determine the issues raised by the pleadings, we must decide what law applies in this case. Alvin, Alpha, Wallace, and Woodrow Bjerken are North Dakota residents, as is the defendant Schultz & Lindsay Construction Company; the plaintiff B-B Ranch is a Minnesota corporation, as is the defendant Ames Sand and Gravel Company, Inc. The latter company has an office and does extensive business in North Dakota. The plaintiffs, whom we have denominated for purposes of discussion as the Bjerkens, contend that because the property involved in this action is situated in Minnesota and the breach of the lease agreement occurred in Minnesota, the substantive law of Minnesota must be applied in this case. Neither of the defendants has taken issue with this contention.

Pertinent is Section 9-07-11, N.D.C.C., which reads:

"9-07-11. What law governs.—A contract is to be interpreted according to the law and usage of the place where it is to be performed, or if it does not indicate a place of performance, according to the law and usage of the place where it is made."

■ This contract by its very nature was to be performed and was performed within the State of Minnesota; accordingly, we must apply the substantive law and usage of Minnesota. See Nordenstrom v. Swedberg, 143 N.W.2d 848, 852 (N.D.1966).

The Bjerkens assert that three basic questions are determinative of all the issues in this case. They state those questions as follows:

"1. What is the obligation of the lessee regarding the condition of the premises at the termination of the lease?

"2. Does the lessee have any rights which survive the termination of the lease; and if so, for how long do such rights continue?

"3. Does the lease agreement require a minimum payment by the lessee without regard to any other rights, privileges or obligations contained in said lease?"

They assert in regard to the first of these questions that the lease agreement provides only general guidance as to the disposition of the overburden. They contend, however, that the lessee of any type of real property is required to leave the property in reasonably good condition and that the lessees in the instant case have not left the property in such condition. They contend that the pile of sand rejected from the lessee's processing plant constitutes an intolerable blight on the property and that it must be moved by someone before the underlying gravel deposits can be mined. They concede that the sand has some use, as evidenced by the fact that Schultz & Lindsay Company did remove some of it from the premises during the lease period at a lesser price. They assert, however, that the amount of this material which has accumulated would preclude the disposition of it within a reasonable time so as to allow access to underlying deposits, and that therefore the material must be moved and that it is only logical that this responsibility fall on those who placed it there.

Schultz & Lindsay Company contends that it was incumbent upon the Bjerkens to show affirmatively that the overburden and reject sand were put in improper places under the terms of the contract and the relationship of the parties over the ten-year period of time. Pertinent to this issue is a part of paragraph (3) and paragraph (5) of the lease, which read:

"(3) * * * The overburden taken off in order to obtain access to said sand, gravel, rock and stone shall be placed in the worked out portion of the pit, as is the usual and customary practice when mining for gravel, provided, however, that should the owners desire the pit to be left open, they shall have the privilege to so direct the Lessee, and in which event the Lessee will place the overburden at some other convenient place on said tracts.

"(5) The Lessee shall have the right to stock pile sand, gravel, rock, stone and waste material as it may deem necessary in its operations at such reasonable location on the demised premises as the Lessor shall direct."

The trial court in effect found that there was no proof that Schultz & Lindsay Company placed overburden and reject sand in an improper place or that it failed to follow instructions given by the Bjerkens as to the placement of either.

We find that the evidence in support of the Bjerken allegations in respect to improper placement of overburden and reject sand is weak.

Applying the rule that the trial court's findings in a trial de novo are entitled to appreciable weight, especially when the witnesses have appeared and testified in person before the trial court, we conclude that the trial court's findings in respect to this issue are correct. Sorenson v. Leslie, 186 N.W.2d 454 (1971), syllabus ¶ 1.

The second question, regarding the survival of the lessee's rights beyond the expiration of the lease, relates to the validity of the counterclaim of Schultz & Lindsay Company and to the issue of the ownership of the mining equipment. The Bjerkens assert that the trial court's ruling, which allowed the counterclaim of Schultz & Lindsay Company, has the effect of perpetuating the lessee's accumulated right to remove gravel for an indefinite period of time. They assert that this places the property owner in a position where he could never assume that the rights of the prior lessees are extinguished, and that a new lessee might, at any time, be subjected to the entry of a prior tenant. They assert that logic and common sense dictate that any right to stockpile and remove material at a later date must be confined to the term of the lease and that the law of Minnesota regarding mining equipment and the right to remove it after the termination of a lease is that the equipment must be removed at or prior to the termination of the lease. They further assert that if

a reasonable time was allowed for removal, the limits of reasonability were far exceeded in this case.

Schultz & Lindsay Company contends that the determination of this question rests entirely upon the terms of the lease and common sense. It asserts that if the lease is ambiguous that the ambiguity must be construed against the Bjerkens and in favor of Schultz & Lindsay Company for the reason that the lease was prepared by the Bjerkens. It concludes that inasmuch as the lease does not provide for the period of time within which the material and equipment must be removed, it is entitled to a reasonable time in which to do this and that a reasonable time has not been exceeded. It further asserts that the Bjerkens have not been harmed by the leaving of the equipment on the premises, as evidenced by the fact that Schultz & Lindsay Company has sold that equipment to Ames Sand and Gravel Company, Inc., to whom the Bjerkens have now leased the premises.

Pertinent to the determination of this question are paragraphs (2), (5), (7), (8) (c), (12) and (14) of the lease.

"(2) The Lessee hereunder shall have the right to place upon said premises such plant, equipment or structures as may be by it deemed necessary for the conduct of its business and at the termination of this lease or any renewal thereof shall have the right to remove from such premises any such plant, equipment or structures as they may have placed thereon.

"(5) The Lessee shall have the right to stock pile sand, gravel, rock, stone and waste material as it may deem necessary in its operations at such reasonable location on the demised premises as the Lessor shall direct.

"(7) The Lessee covenants and agrees that it will remove and pay for a minimum of 125,000 cubic yards of gravel during each of the ten years of the existence of this lease. At the Lessee's option it may, during the first year, remove and pay for a minimum of 35,000 cubic yards of gravel, but if the option is exercised, the balance of the first year's minimum in the amount of 90,000 cubic yards shall be added to the minimum requirement for the succeeding years, it being understood and agreed that the Lessee shall remove and pay for a minimum of 1,250,000 cubic yards within the first ten years of this lease.

"(8) * * *

"(c) Any surplus stock pile of sand or aggregate remaining on said premises in an amount over and above the amount of material removed from said premises during the calendar year, and the amount of gravel, rock and stone stock piled on said premises as of December 31st of each year, the Lessee shall be charged therefor at the rate of 20¢ per cubic yard, and the accounting and payment therefor shall be made within sixty (60) days thereafter, provided, however, that when such surplus has been paid for at the end of one year, and if the same surplus remains at the end of any other year, there shall be no requirement for the payment for such surplus as was on the premises on December 31st of the prior year.

"(12) In the event that the Lessee fails to remove the minimums required by the terms of this lease, they have a right to accumulate such minimums and remove same at a later date.

"(14) In the event any default occurs under the terms and conditions of this lease to be performed by the Lessee, the Lessors shall have the right to give a thirty (30) day notice in writing to the Lessee, demanding the removal of any such default, and in the event the Lessee fails to remove or correct such default within said thirty-day period, the Lessors can then, at their option, terminate this lease. If default occurs in the terms of this lease and the same is terminated by the Lessors, there shall be no further

rights or remedies available to the Lessors, except the forfeiture of the Lease and of the stock piles of material then existing on said demised premises, and the Lessee shall have ninety (90) days within which to remove any plant, structures or equipment placed on said premises by said Lessee."

■■ It is our view that the last part of the second sentence of paragraph (7) of the lease, which reads, "That the Lessee shall remove and pay for a minimum of 1,250,000 cubic yards within the first ten years of this lease," requires the lessee to not only pay $250,000 to the lessors within the ten-year period, but also to remove from the premises within that ten-year period the 1,250,000 cubic yards of material. This we conclude notwithstanding the language in paragraph (12) of the lease, which states that the lessee shall "have a right to accumulate such minimums and remove same at a later date." It is our view that the minimums referred to in paragraph (12) relate to yearly minimums of $25,000 worth of material, whereas paragraph (7) relates to the contract minimum obligating the lessee to remove and pay for a minimum of 1,250,000 cubic yards within the first ten years of the lease. This conclusion is consistent with the view expressed in Pillsbury Flour Mills Company v. Lake Superior Consolidated Iron Mines, 178 Minn. 254, 226 N.W. 843 (Minn.1929), to the effect that a mining lease is a lease and not a sale of minerals in place, and that therefore the rights of the parties under the lease are referable to the law of landlord and tenant rather than the law of sales.

See also 54 Am.Jur.2d Mines and Mining § 145 (1971).

■■ Our determination of the meaning of this contract relative to accumulation of minimums is consistent with a familiar rule of construction quoted in the Minnesota Supreme Court decision of Telex Corporation v. Data Products Corporation, 271 Minn. 288, 135 N.W.2d 681 at 685, from an earlier Minnesota decision based on Dunnell:

" 'It is an elementary principle of law that a contract must be construed as a whole. The intention of the parties must be gathered from the entire instrument and not from isolated clauses. As far as is reasonably possible it is to be construed so as to harmonize all of its parts. 4 Dunnell, Dig., 3 ed., § 1823.' "

■ We are of the opinion, however, that the lessee was entitled to a reasonable time within which to remove its equipment, in light of the nature of the equipment and the fact that if the lessee was to gain the benefit of the entire term of the lease it needed the equipment through the last day of the lease. This right the lessee had notwithstanding that it may not have used the equipment, as asserted by the Bjerkens, for the last year and one half of the lease.

■ The Bjerkens assert that pursuant to paragraph (14) of the lease ninety days would be a reasonable time within which to remove the equipment and that that time has been greatly exceeded in this case. A review of paragraph (14) causes us to believe that it applies only in the event of a default and only after the lessors have given the lessee a thirty-day notice in writing demanding removal of any default. We are not cognizant of the service of any notice in writing as required under paragraph (14).

Under the circumstances of this case, we find no abandonment of the equipment and no right in the Bjerkens to possession or ownership of it.

■ The third basic question asserted by the Bjerkens to be decided on this appeal is whether the lease agreement requires

a minimum payment by the lessee without regard to any other rights, privileges or obligations provided for in the lease.

The Bjerkens contend in this regard that the ten-percent discount provided for in paragraph (9) was permissible only after the minimum amount of material had been purchased each year and then only after proper consultation with the lessors. Paragraph (9) reads:

"(9) It is agreed that in the event the Lessee, in order to obtain any substantial contract, is required to lower its price per cubic yard below its regularly established price for the time being, the payment of 20¢ per cubic yard to be made to the Lessors may be reduced in the same proportionate amount, not to exceed 10%. Any reduction above 10% shall be open to negotiation by both parties."

The evidence submitted in this regard by one of the officers of Schultz & Lindsay Company was that competition was such that it was necessary for the company to reduce its price to secure substantial contracts. In light of that evidence and the last sentence of paragraph (9), which requires negotiation between the parties for reductions above the ten percent, we conclude that this ten-percent reduction taken without consultation or negotiation was proper.

█ Reject sand was purchased during the term of the lease at a rate not provided for in the lease. The Bjerkens argue that the payment made for the reject sand at the lower rate not provided for in the written contract is not to be credited as a payment toward the $250,000 minimum guaranteed over the ten-year period. They contend that the interpretation of this transaction as urged by the defendants and as accepted by the trial court results in a modification of the original lease agreement. To them it is inconceivable that this could have been the intent of the parties inasmuch as the Bjerkens would have had no inducement to consent to such modification. They believe it is more probable that the defendants agreed to buy and the plaintiffs agreed to sell the reject sand at a lesser price so that the plaintiffs might achieve a greater income from the property without affecting the minimum payment due under the lease.

Defendant Ames Sand and Gravel Company, Inc., points out that Mr. Lindsay of Schultz & Lindsay Company testified that the Bjerkens agreed that the reject sand would be paid for at a price of 8.65¢ per ton. It asserts that the Bjerkens now, without producing any evidence, urge that this was a collateral agreement and due to them in addition to the minimum amount called for under the contract. Ames points out that the Bjerkens offered no evidence relative to the negotiations to dispute that the oral contract was any different from that stated by Mr. Lindsay.

Mr. Lindsay did not testify that the Bjerkens agreed to permit the company to apply the payments for reject sand toward the minimum. His testimony was that regular accountings were made to the Bjerkens over a ten-year period without objection on their part to the reporting of the purchase of the reject sand at the lower rate as a part of the accounting made under the written lease.

In light of this state of the record, we conclude that the payments for the reject sand do not apply toward the payment of the ten-year minimum of $250,000.

The judgment of the trial court is therefore reversed and the case is remanded, with instructions to the trial court to determine the amount due the Bjerkens by the defendants Schultz & Lindsay Company and Ames Sand and Gravel Company, Inc., pursuant to the minimum requirements of

the lease without considering the payments made by Schultz & Lindsay Company for the reject sand.

STRUTZ, C. J., and PAULSON and KNUDSON, JJ., concur.

TEIGEN, Judge (concurring specially).

I concur. This case differs from the case in which I concurred specially, entitled Interstate Collection Agency, Inc. v. Kuntz, 181 N.W.2d 234 (N.D.1970), for the reason that the evidence on the question of the amount due is not sufficiently clear to permit us to make this computation. It has been suggested that the trial court is in a much better position to do so as it may obtain clarification of the meaning of a certain stipulation from the attorneys who tried the case without a new trial being granted.