715 F.2d 1280
 219 U.S.P.Q. 585
 Louis J. KELLER and Cyril N. Keller, Appellees,
v.
CLARK EQUIPMENT COMPANY, and Clark Equipment, A.G., Appellants.
CLARK EQUIPMENT COMPANY, Appellant,
v.
Louis J. KELLER and Cyril N. Keller, Appellees.
 No. 82-2066.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 16, 1983.
Decided Aug. 11, 1983.
 
 Herman H. Bains, Malcolm L. Moore, Williamson, Bains, Moore & Hansen, Minneapolis, Minn., for appellees.
 John D. Kelly, Nicholas J. Spaeth, Vogel, Brantner, Kelly, Knutson, Weir & Bye, Fargo, N.D., James P. Ryther, McDougall, Hersh & Scott, Fred E. Schulz, Thomas E. Patterson, Wildman, Harrold, Allen & Dixon, Chicago, Ill., Harry G. Thibault, Buchanan, Mich., for appellant Clark Equipment Co.
 Before LAY, Chief Judge, HEANEY, Circuit Judge, and RENNER,* District Judge.
 HEANEY, Circuit Judge.
 
 
 1
 This case began as a challenge to the validity of three patents covering various aspects of a successful four wheel loader marketed initially by Melroe Manufacturing Company (Melroe), and subsequently by Clark Equipment Company (Clark), under the trade name "Bobcat." The present appeal involves one of the three patents--a manufacturing patent entitled "tractor vehicle and drive therefore"--which this Court declared invalid under 35 U.S.C. § 102(b) because the application for it was not filed within one year after the invention had been offered for sale. Clark Equipment Co. v. Keller, 197 U.S.P.Q. 209 (D.N.D.1976), aff'd, 570 F.2d 778 (8th Cir.), cert. denied, 439 U.S. 825, 99 S.Ct. 96, 58 L.Ed.2d 118 (1978). Clark now appeals from the district court's holding that Melroe was liable to Cyril and Louis Keller--two of the owners of the manufacturing patent in question--for its negligent failure to file the patent application in a timely manner and that Clark assumed that liability when it purchased Melroe in 1969. We affirm.
 
 I.
 FACTS
 A. THE PATENTS
 1. The 503 Patent
 
 2
 In 1956, Louis and Cyril Keller began building a self-propelled, three-wheel loader. The Kellers completed the first loader in February, 1957, and throughout 1957 and 1958, they made various modifications to improve the machine's design. On December 1, 1958, the Kellers filed an application for a patent on the three-wheel loader. The Patent Office issued U.S. Patent No. 3,151,503 (503 patent) on October 6, 1964. The 503 patent was a mechanical patent entitled "transmission system" and its duration was for 17 years.
 
 2. The 254 Patent
 
 3
 In about September, 1958, the Kellers became employed by Melroe. They continued to work on the development of their three-wheel loader, which Melroe was marketing with only limited success. In the summer of 1961, Louis Keller and Clifford Melroe, then president of Melroe, began experimenting with a self-propelled four-wheel skid steer loader.
 
 
 4
 During the experimentation in 1961, four prototypes of the four-wheel loader were produced. While still developing the prototypes, Melroe began demonstrating and promoting the new loader, which would be marketed under the trade name "Bobcat," in August 1961. Shortly thereafter, Melroe offered the new loader for sale to Midland Cooperative on September 29, 1961, and to the Farmers Union Central Exchange one week later. In December, 1961, the company commenced commercial production of the Bobcat. On January 4, 1962, it made its first commercial delivery.
 
 
 5
 Because of the advertising and sales activity surrounding the Bobcat, Louis Keller began urging Clifford Melroe in September or October, 1961, to seek patent protection on the four-wheel loader. When Clifford expressed no interest, Louis obtained permission from Roger Melroe--the company's vice president and Clifford's brother--to pursue patent protection for the four-wheel loader. In February, 1962, and then in early May, 1962, Louis Keller authorized his attorney to begin preparing applications for a design patent and mechanical patent, respectively.
 
 
 6
 At a meeting between the Kellers and the Melroes on May 31, 1962, Clifford Melroe learned for the first time of Louis Keller's patent application efforts. Clifford accused Louis of attempting to steal the patents for the four-wheel loader. Although Roger Melroe attempted to explain the circumstances to his brother, Clifford demanded that he be given all material relating to the mechanical patent and that the company's attorney prepare the application for that patent. With respect to the design patent, Clifford agreed to permit the Kellers' attorney to proceed with the patent application since it was nearly completed, and agreed that he, Louis and Cyril should be listed as co-inventors. Clifford, however, insisted that the design patent be assigned to the company.
 
 
 7
 On June 21, 1962, the Kellers and Clifford Melroe signed the documents for the design patent application and the assignment of patent ownership to the company. The design patent application was filed on July 25, 1962, and subsequently was issued on May 21, 1963, as U.S. Patent No. D195,254 (254 patent) under the title "self-propelled loader."
 
 3. The 117 Patent
 
 8
 On June 13, 1962, Clifford Melroe contacted the company's patent attorney, John Swindler, concerning a mechanical patent for the new loader. In subsequent conversations, Clifford discussed assigning the mechanical patent to the company and stated that he and Louis Keller were to be named as inventors. Clifford also discussed the application deadline with Swindler. Clifford was generally familiar with the application requirements of the patent laws from his past experience with obtaining patents for Melroe products, and he knew that the four-wheel loader had been demonstrated in the summer or fall of 1961. Nonetheless, Clifford indicated to Swindler that the first loader was not placed on the market until January 4 or 5, 1962.
 
 
 9
 Swindler, sent the completed patent application and assignment of patent documents to Louis Keller and Clifford Melroe in October, 1962. Keller and Melroe promptly signed the application and returned it to Swindler. They never executed or returned the document assigning the patent to the company, however. Swindler filed the application for the mechanical patent on the four-wheel loader on October 23, 1962--approximately three weeks after the one-year filing deadline. The patent office issued U.S. Patent No. 3,231,117 (117 patent) on January 15, 1966. It was a mechanical patent including eighteen claims which was entitled "tractor vehicle and drive therefor." If the 117 patent had been timely filed, it would have expired on January 25, 1983.
 
 B. THE ROYALTY AGREEMENTS
 
 10
 The respective rights and obligations of the Kellers and Melroe, and its successor Clark, with respect to the 503, 117 and 254 patents were governed by three agreements entered into by the parties.
 
 1. The 1959 Agreement
 
 11
 In May, 1959, the Kellers and Melroe entered into an agreement under which the Kellers granted Melroe an exclusive right to manufacture the three-wheel loader, and lifting and scraping devices, disclosed in the 503 patent application. In return, Melroe agreed to pay the Kellers a royalty fee of 2.5 percent of the sales price of each loader sold.
 
 2. The 1963 Agreement
 
 12
 On October 1, 1963, the Kellers executed an agreement with Melroe which superceded their 1959 agreement.[1] The 1963 agreement contained two principal changes. First, the Kellers granted the company an exclusive right to make and sell loaders embodying the invention claimed in the 117 patent application, as well as the 503 patent referred to in the 1959 agreement. Second, Melroe agreed to pay royalties to the Kellers pursuant to a fixed rate, rather than the percentage method utilized in the 1959 agreement.[2] Melroe continued to pay royalties to the Kellers under the 1963 agreement until August, 1969.
 
 
 13
 On August 11, 1969, Clark and Melroe entered into a purchase of assets agreement. The agreement provided that Melroe, in exchange for 475,000 shares of Clark's voting common stock, would convey to Clark all of Melroe's assets, except as specifically excluded in the agreement. The agreement further provided that Clark would assume all of Melroe's liabilities, obligations, and covenants except as specifically excluded in the agreement. Pursuant to this purchase agreement, Clark continued to pay the Kellers royalties under the 1963 Melroe agreement.
 
 3. The 1971 Agreement
 
 14
 In May, 1971, the Kellers and Clark entered into a license agreement which superceded the 1963 agreement. Again, the new agreement contained two principal changes. First, the 254 patent was covered for the first time, when the Kellers granted Clark an exclusive right to make, use and sell (with a right to grant sublicenses) the inventions claimed in the 503, 117 and 254 patents. Second, the royalty rate was changed, with Clark agreeing to pay the Kellers $15 for each Bobcat it sold and $10 per loader sold by a sublicensee. Clark continued to make royalty payments under the 1971 agreement until approximately the second quarter of 1972.
 
 C. INFRINGING ACTIVITY
 
 15
 Shortly after Melroe began marketing the Bobcat loader in 1961, competing loaders appeared on the scene. By 1966, at least five possible unlicensed infringers were in the market. In 1966, Melroe and the Kellers brought a patent enforcement action against Universal Manufacturing to halt its infringing activities. Universal defended on the ground, inter alia, that the 117 patent was invalid because the application for it had been filed too late. In 1968, Owatonna Manufacturing Company, Inc., filed a declaratory judgment action against Melroe and the Kellers to have the 504, 117 and 254 patents declared invalid. Again, the 117 patent was challenged on the ground of late filing. Both the Universal and Owatonna lawsuits were settled without a determination of the validity of the patents.
 
 
 16
 Subsequently, in 1970, Clark entered into sublicense agreements with Owatonna and J.I. Case Company to manufacture and sell loaders covered by the 503, 117 and 254 patents. Both license agreements obligated Clark to enforce its patent rights against infringers.
 
 
 17
 Near the time of the signing of the 1971 Clark-Keller agreement, Owatonna and Case began threatening to cease their license payments if Clark did not take action against the unlicensed infringers in the market. In response, Clark stopped paying royalties to the Kellers near the end of the first quarter of 1972, and thereafter filed an action seeking a declaration that its 1971 royalty agreement with the Kellers was unenforceable because the three subject patents were invalid. This filing initiated the protracted legal battle summarized below.
 
 II.
 PROCEDURAL BACKGROUND
 
 18
 Clark filed its declaratory judgment action in October, 1972.[3] In August, 1973, the Kellers filed an answer and a counterclaim. The counterclaim (1) sought royalties due from Clark under the 1971 royalty agreement with the Kellers and under certain sublicense contracts between Clark and others, and (2) alleged that Clark or its predecessor in interest, Melroe, had negligently failed to comply with the requirements of 35 U.S.C. § 102(b) by neglecting to file a patent application for the 117 patent within the one-year period after the invention had been offered for sale.
 
 
 19
 In response to this negligence counterclaim, Clark filed a third-party complaint against the law firm of Williamson, Bains and Moore. Clark alleged that the Williamson firm had represented Louis Keller and Clifford Melroe in prosecuting the application for the 117 patent, and that it had breached its professional obligation to investigate the facts and to file the patent application in a timely manner.
 
 
 20
 On July 25, 1973, the Kellers filed a separate action against Clark. The lawsuit alleged that Clark and its wholly-owned Swiss subsidiary, Clark Equipment A.G. (CEAG), had failed to account for and pay royalties due pursuant to a license agreement between the Kellers and CEAG, which named CEAG as an exclusive licensee under certain foreign patents corresponding to the licensed patents in the agreement with Clark.
 
 
 21
 Thereafter, the district court consolidated the separate actions initiated by the Kellers and Clark. Then, in April, 1974, the district court ordered the issues of liability for the alleged late filing of the 117 patent severed from the declaratory judgment action concerning the parties' rights and obligations under the various license agreements. In July, 1974, the district court ordered a separate trial on the issue of the validity of the three patents in question. After a lengthy trial, the district court held that the 503 and 254 patents were valid. Clark Equipment v. Keller, supra, 197 U.S.P.Q. at 94-98, 117-121. It further held that the 117 patent covered a patentable invention, but the patent was invalid under 35 U.S.C. § 102(b) because the patent application had been filed more than one year after the invention had been on sale. Id. at 109-114. On appeal, this court affirmed the district court's decision with respect to the 503 and 117 patents, but reversed its decision that the 254 patent was valid. Clark Equipment Co. v. Keller, supra, 570 F.2d at 784-799.
 
 
 22
 In a March 30, 1981, decision,[4] the district court held the 503 patent did not cover any product made or sold by Clark, and accordingly, concluded that Clark was not liable to the Kellers under the 1971 royalty agreement for any royalties with respect to that patent. On the Kellers' negligence claim, however, the district court held that Melroe negligently failed to file the application for the 117 patent in a timely manner. The court concluded that pursuant to the purchase of assets agreement between Clark and Melroe, Clark expressly assumed Melroe's tort liability arising from the late filing of the 117 patent. Alternatively, the court held that Clark was liable for Melroe's negligence under the de facto merger doctrine. Finally, the court concluded that the Kellers' damages consisted of all the royalties they would have received if the 117 patent had not been adjudged invalid. Clark now appeals from this judgment.
 
 III.
 DISCUSSION
 A. STATUTE OF LIMITATIONS
 
 23
 Clark contends that the Kellers' negligence action is barred by the applicable six-year statute of limitations established in N.D.Cent.Code § 28-01-16. Clark argues that the Kellers' cause of action accrued on September 30, 1962, which was the last day on which the 117 patent application could have been timely filed, and thus the limitations period ran out on September 30, 1968--four years before the plaintiffs filed suit in 1972. The district court rejected Clark's position, holding that the Kellers initiated their claim within the limitations period because their cause of action did not accrue until 1972 when Clark ceased paying the royalties due under the parties' 1971 agreement. We affirm.
 
 
 24
 The district court succinctly summarized the controlling principles of North Dakota law:
 
 
 25
 A cause of action accrues when the right to commence it comes into existence; when it can be brought in a court of law without being subject to dismissal for failure to state a claim. * * * [A]n essential element of every cause of action is that plaintiff has suffered an injury caused by defendant's wrongful act. Injury is usually but not always contemporaneous with the wrongful act. It is the conjunction of damages and wrongful act that creates a cause of action for tort or contract, and there is no cause of action if either damage or wrong is wanting. * * *
 
 
 26
 Keller v. Clark Equipment Co., 474 F.Supp. 966, 969 (D.N.D.1979) (citations omitted).
 
 
 27
 The district court found that although the wrongful act--the failure to timely file the patent application--occurred in 1962, the Kellers suffered no injury until 1972 when Clark stopped making royalty payments. Clark, relying principally upon Boehm v. Wheeler, 65 Wis.2d 668, 223 N.W.2d 536 (1974), argues that both the wrongful act and injury occurred in 1962 when the application deadline expired.
 
 
 28
 In Wheeler, the Wisconsin Supreme Court held that a negligence cause of action accrued against an attorney who filed an untimely patent application on the last day that application could have been timely filed. 223 N.W.2d at 541. The court stated:
 
 
 29
 It was in October or November, 1965 [when the one-year application deadline passed] that the plaintiffs lost their right to get a patent on the power unit. We think that the loss of the right to a patent is the loss of the right to exclude others and, therefore, the injury occurred on that date the right to a patent was lost. Patents do have the attribute of personal property and are assignable. 35 U.S.C., Sec. 261. The right to exclude others is a valuable right, and the loss of it would be an injury which would commence the running of the statute of limitations. Therefore, the trial court was correct in holding the first cause of action accrued in 1965.
 
 
 30
 Id.
 
 
 31
 Relying on the reasoning in Wheeler, Clark urges that even though the Kellers continued to receive royalty payments into 1972, they were injured, and thus could have brought their negligence claim, in 1962 because they lost their patent right to exclude when the application was not filed in time.
 
 
 32
 The Wheeler case is distinguishable from this one. In that case, the Patent Office apparently never issued a patent because of the untimely filing of the application, or if it did so, the plaintiffs never received any payment pursuant to the license agreement. Thus, the plaintiffs in Wheeler never received any of the royalties to which their patent entitled them, and their injury consequently was as immediate as it was obvious. In sharp contrast, in this case even though the Kellers technically lost their right to exclude others in 1962 when the patent was untimely filed, they continued to receive royalty payments for ten years from first Melroe and then Clark. Thus, the Kellers theoretical loss of their right to exclude infringing competitors did not actually harm them.
 
 
 33
 Clark, however, contends that the injury resulting from the loss of the right to exclude others was not merely theoretical. Specifically, Clark claims that the Kellers did not vigorously seek to enforce their patent rights against infringers because they had learned in the 1966 infringement action against Universal that the 117 patent might be invalid due to late-filing. Additionally, Clark emphasizes that because the Kellers had learned of the potential late-filing problem in the 1966 litigation, they had sufficient notice to file a cross-claim against Melroe in the infringement action against Universal or otherwise initiate a declaratory judgment action prior to September 30, 1968.
 
 
 34
 We find Clark's position unpersuasive. Common sense dictates that the Kellers would have no reason to sue Melroe, their own employer, as long as it was continuing to pay the royalties due under the parties' agreement. Moreover, if the Kellers had filed a negligence claim while they were still receiving royalties, it almost surely would have been subject to dismissal. An essential element of any negligence action in North Dakota is damage which was proximately caused by the alleged breach of duty. See infra, at 1287. While the necessary proof of damage need not be exact, it cannot be mere speculation or conjecture. See Johnson v. Monsanto Co., 303 N.W.2d 86, 93 (N.D.1981); United Power Association v. Heley, 277 N.W.2d 262, 268 (N.D.1979). Clark's theory that the Kellers were damaged in some amount because their knowledge of the late-filing problem allegedly caused them to not vigorously enforce their patent rights is at best speculative and conjectural.
 
 
 35
 In any event, we are not convinced that the Kellers were less than vigilant in enforcing their patent rights. They, along with Melroe, brought infringement claims against Universal and Owatonna in 1966 and 1968, respectively. An inventor need not always litigate the validity of his or her patent against every possible infringer to retain his or her patent rights. See Jenn-Air Corp. v. Penn Ventilator Co., 464 F.2d 48, 50 (3rd Cir.1972); Montgomery Ward & Co. v. Clair, 123 F.2d 878, 883 (8th Cir.1941).
 
 
 36
 Accordingly, the district court did not err in finding that the negligence action filed by the Kellers in 1973 did not accrue until 1972, and that it thus was not barred by the applicable six-year statute of limitations.
 
 B. THE NEGLIGENCE CAUSE OF ACTION
 
 37
 The elements of a negligence cause of action under North Dakota law are the existence of a duty, failure to discharge that duty and resulting injury which is proximately caused by the breach of duty. E.g., Brauer v. James J. Igoe & Sons Construction, Inc., 186 N.W.2d 459, 468 (N.D.1971). Clark contends that the Kellers are not entitled to relief in this case because they possessed no protectible interest in the 117 patent in 1962 and, therefore, Melroe owed them no duty to file the patent application in a timely manner. Specifically, Clark urges that even though Louis Keller[5] was named inventor in the 117 patent, Melroe was the exclusive owner of the patent because it had hired Louis to engage in inventive activities.
 
 
 38
 Clark relies primarily on N.D.Cent.Code § 34-02-11, which states:
 
 
 39
 Everything which an employee acquires by virtue of his employment, whether acquired lawfully or unlawfully or during or after the expiration of the term of his employment, except any compensation which is due him from his employer, belongs to the employer.
 
 
 40
 Although there are no cases construing this North Dakota law, the prevailing view in the United States is that when a person is employed for the purpose of inventing, and he or she succeeds in that task during the period of employment, the employer is the equitable owner of the invention and the employee must assign to the employer any patent he or she may obtain on the invention. E.g., United States v. Dubilier Condenser Corp., 289 U.S. 178, 187, 53 S.Ct. 554, 557, 77 L.Ed. 695 (1933); Melin v. United States, 478 F.2d 1210, 1213 (Ct.Cl.1973).
 
 
 41
 The district court found that Louis Keller was hired for his inventive abilities. Thus, absent any express or implied agreement by the parties to the contrary,[6] Melroe would have been the exclusive owner of the 117 patent under N.D.Cent.Code § 34-02-11. The district court, however, found that Melroe indeed agreed to recognize that the Kellers retained an ownership interest in the 117 patent and never claimed sole ownership. The court primarily based this finding on the 1963 agreement in which Melroe agreed to pay royalties to the Kellers on the 117 patent application in exchange for an exclusive license.
 
 
 42
 Clark challenges the district court's reliance on the 1963 agreement, contending that the agreement constituted a compromise to resolve a dispute over who owned the 117 patent under which Melroe conveyed to the Kellers an interest in the 117 patent in exchange for a reduction in royalty fees due under the 1959 agreement. Clark also urges that the 1963 agreement was not actually finalized until 1965 after protected negotiations. Thus, Clark contends the 1963 agreement provides no evidence that the Kellers possessed an ownership interest in the 117 patent in 1962 which could give rise to a duty on the part of Melroe to timely file the patent application.
 
 
 43
 Clark's position is untenable. The plain language of the 1963 agreement provides that "the Kellers grant to Melroe the sole and exclusive right and license" to make and sell loaders embodying the 117 patent. (Emphasis added). Moreover, the whereas clauses of the agreement explicitly recognize that "the Kellers have developed and invented certain self-propelled vehicles" and that "Melroe desires to obtain and the Kellers are willing to grant Melroe a license to make and sell such vehicles." (Emphasis added). Nowhere in the agreement does Melroe agree to convey anything to the Kellers--except for a royalty fee in exchange for the exclusive license granted by the plaintiffs. As the district court recognized, if the Kellers possessed no ownership interest in the 117 patent prior to the 1963 agreement, they could not have granted a license to Melroe nor would the company have had to agree to pay them royalty fees.
 
 
 44
 With regard to the effective date of the 1963 agreement, the document is dated October 1, 1963. The record, read as a whole, suggests that the agreement was effective as of that date even though some details remained to be finalized. In any event, even if the question of the Kellers' ownership interest in the 117 patent was not resolved until 1965, the fact remains that in the agreement signed by the company, it recognized that the Kellers had developed various self-propelled loaders, that they had a protectable interest in the 117 patent and that Melroe must pay royalty fees to obtain the Kellers' permission to utilize that patent. The clear inference from this recognition in the 1963 agreement is that the Kellers held an ownership interest in the 117 patent in 1962 when Melroe failed to file the patent application in a timely manner.[7]
 
 
 45
 The district court also properly recognized that the 1971 agreement between Clark and Melroe provides evidence that the Kellers possessed an ownership interest in the 117 patent which created a duty to file the patent applications. That agreement expressly states that "the Kellers are joint owners" of the 503, 117 and 254 patents, and, like the 1963 agreement, provides that the Kellers "grant" an exclusive license to Clark in exchange for certain royalty payments.
 
 
 46
 In summary, the fact that Melroe, and subsequently Clark, paid royalties to the Kellers on the 117 patent for over nine years is inconsistent with Clark's present claim that the Kellers did not have any ownership interest in that patent. Accordingly, the district court did not err in finding that the plaintiffs had such a protectable interest and that Melroe consequently had a duty to file the application for the 117 patent in a timely manner.[8]
 
 C. CLARK'S LIABILITY
 1. Contractual Assumption
 
 47
 As a general rule, when one company sells or otherwise transfers all of its assets to another company, the transferee is not liable for the debts and liabilities of the transferor. Armour-Dial, Inc. v. Alkar Engineering Corp., 469 F.Supp. 1198, 1201 (E.D.Wis.1979); J.F. Anderson Co. v. Myers, 296 Minn. 33, 206 N.W.2d 365, 368 (1973); Annot., 49 A.L.R.3d 881 (1973) (collected cases). That general rule is inapplicable, however, when the transferee expressly or impliedly agrees to assume the transferor's debts and liabilities. Id.[9]
 
 
 48
 The district court found that in this case the plain terms of the 1969 purchase agreement between Clark and Melroe demonstrated Clark's intent to assume the Keller liability. We agree with this determination.
 
 
 49
 In the whereas portion of the purchase agreement, Clark agreed to "assume all the liabilities, obligations and covenants of Melroe, except as specifically excluded herein, all as hereinafter provided." The written assumption attached to the purchase agreement pursuant to sections 3.1 and 3.2 of the agreement stated:
 
 
 50
 [Clark] * * * assumes and agrees to pay * * * to the extent that they are existing and outstanding on the date hereof, * * * such liabilities of Melroe * * * as are to be assumed by Clark * * * under the terms of [the 1969 agreement].
 
 
 51
 The district court found that Clark assumed Melroe's liability to the Kellers under the above-stated provisions of the purchase agreement. The court first found that the liability was a contingent one because although the negligent act occurred prior to the closing of the purchase agreement in 1969, the injury to the Kellers--Clark's cessation of royalty payments--did not occur until after the closing. The court then found that because Clark did not exclude this contingent liability from those obligations, it agreed to assume responsibility for Melroe's liability to the Kellers.
 
 
 52
 Clark contends that because the district court held that the Kellers' negligence claim did not accrue until 1972 for statute of limitations purposes, it must follow that the claim did not exist at all in 1969. Therefore, Clark argues that it could not have agreed to assume responsibility for the Keller liability since it assumed only those obligations "existing and outstanding" on the date of the purchase agreement. We cannot agree.
 
 
 53
 The district court properly recognized that in 1969 Melroe's contingent liability to the Kellers was already in existence because the negligent conduct had occurred in 1962. The 1969 purchase agreement demonstrates that Clark considered such contingent liabilities to be "existing and outstanding" obligations since it lists several contingent debts which Clark agreed to pay if Melroe's liability for them was established after the agreement was closed. Moreover, because the Kellers were continuing to receive royalties at the time of the closing, and Melroe thus had no reason to believe that the Kellers would assert their contingent negligence claim, the failure of the 1969 purchase agreement to list the Kellers' claim as a contingent liability evinces no intention to exclude that liability from those assumed by Clark. See infra, at 1289-1291.
 
 
 54
 Clark alternatively urges that even if the Kellers' claim existed in 1969, it was expressly excluded from the assumption agreement because Clark agreed to assume only those liabilities disclosed by Melroe, and Melroe did not disclose the Kellers' claim. Specifically, Clark relies on section 3.1 of the agreement which stated that Clark did not assume "any liabilities arising out of the breach of any representation or warranty of Melroe contained herein" nor "any liabilities not disclosed due to any misrepresentation by Melroe herein." Clark contends that the Keller liability arises from Melroe's misrepresentation in not disclosing the contingent negligence claim.
 
 
 55
 The district court rejected Clark's position, finding that Melroe had made no misrepresentations with respect to the Keller liability. The court reasoned:
 
 
 56
 The only provisions of the Agreement in which Melroe warranted or represented anything which would relate to the late filing tort claim are sections 1.4, 1.8, 1.14 and 1.21. In these provisions, however, Melroe only represented that the disclosures were correct to its best knowledge. Since Melroe had no knowledge of the tort claim, its nondisclosure of the claim was not due to any misrepresentation contained in the agreement. Therefore, the late filing tort claim was not specifically excluded, and thus according to the terms of the Agreement, was assumed by Clark.
 
 
 57
 We agree with this analysis.
 
 
 58
 In section 1.6 of the agreement, Melroe represented that the listed contingent liabilities--which did not include the Kellers' claim--reflected all "known" claims, and that to the "best of its knowledge," no legal action was threatened which would materially affect the company's liabilities. Similarly, in section 1.8 of the agreement, Melroe warranted that "to the best of its knowledge" there were no infringement claims relating to the company's patent except those disclosed--which again did not include the Kellers' claim with respect to the 117 patent. Again, in section 1.14, Melroe warranted that to the "best of its knowledge" it was not engaged in or threatened with any legal action.
 
 
 59
 The foregoing sections demonstrate that the "misrepresentations" which Clark excluded in section 3.1 from its general assumption of liability were only those knowingly made. Even though Melroe was aware of the late-filing problem raised in the Universal and Owatonna litigation in 1966 and 1968, Melroe had no reason to believe in 1969 that the Kellers would assert any claim with respect to the 117 patent. Melroe never failed to fulfill its contractual obligation to pay royalties to the Kellers for use of the 117 patent. Indeed, if Clark had not ceased making royalty payments in 1972, the Kellers' contingent claim never would have become a present one and they would not have filed suit. Thus, Melroe's failure to disclose the Kellers' contingent claim did not constitute a "misrepresentation" within the meaning of section 3.1 of the purchase agreement, and Clark cannot rely on that section to urge that it excluded the Kellers' claim from the liabilities it assumed in 1969.
 
 
 60
 Notwithstanding the above analysis, Clark argues that Melroe's failure to disclose its contingent liability constituted a misrepresentation within the meaning of section 1.21 of the agreement because it contains no "best knowledge" provisions.[10]
 
 
 61
 The district court, however, held that in order to construe section 1.21 in harmony with the other warranty provisions in the agreement, an omission would be misleading only if it violated the specific disclosure requirements contained in sections 1.4, 1.8 and 1.14. This construction was clearly proper under North Dakota law. The intentions of contracting parties must be determined from the instrument as a whole, not from any isolated clause. Bjerken v. Ames Sand Gravel Co., 189 N.W.2d 366, 374 (N.D.1971). Moreover, a contract must be construed so as to harmonize its various parts whenever reasonably possible. Id.; N.D.Cent.Code § 9-07-06. Accordingly, because in 1969, Melroe did not know, nor have reason to know, of the contingent liability to the Kellers, it committed no misrepresentations under the specific disclosure sections or section 1.21 of the purchase agreement.[11] The district court, therefore, did not err in finding that Clark assumed the Keller liability in the 1969 agreement.
 
 2. De Facto Merger
 
 62
 The district court alternatively held that Clark was liable for Melroe's negligence under the de facto merger doctrine. We affirm.
 
 
 63
 Although the North Dakota courts have not addressed de facto merger questions, the court below found that North Dakota would likely follow the majority view concerning the requirements and applicability of the doctrine. The district court concluded that to find a de facto merger, the following elements must be present:
 
 
 64
 (1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.
 
 
 65
 (2) There is a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, this stock ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.
 
 
 66
 (3) The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.
 
 
 67
 (4) The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation.
 
 
 68
 We find no error in this construction of the de facto merger test. See, e.g., Atlas Tool Co., Inc. v. Commissioner, 614 F.2d 860, 870-871 (3d Cir.), cert. denied, 449 U.S. 836, 101 S.Ct. 110, 66 L.Ed.2d 43 (1980); Ladjevardian v. Laidlaw-Coggeshall, Inc., 431 F.Supp. 834, 838-839 (S.D.N.Y.1977); Shannon v. Samuel Langston Co., 379 F.Supp. 797, 801 (W.D.Mich.1974).
 
 
 69
 The district court found that each of these four factors was present in this case.[12] Clark does not seriously dispute these findings. Instead, Clark contends a de facto merger did not occur here because two indispensable requirements of the doctrine are lacking: (1) the corporation selling its assets must not have been amenable to suit after the sale; and (2) the sale must have been performed to actually or constructively defraud the selling corporation's creditors.
 
 
 70
 Clark urges that the Kellers could have pursued their negligence action under various provisions of North Dakota and Delaware law which purportedly permit creditors to sue a dissolving corporation which is winding up its affairs or to proceed against the former stockholders of a dissolved corporation to whom the assets were distributed. The district court rejected this claim, finding that the Kellers had no effective remedy under either Delaware or North Dakota law. We agree.
 
 
 71
 Gwinner, the holding company which succeeded Melroe, never was anything but a corporate shell with essentially no assets or business activities. While Gwinner technically remained in business until 1974,[13] it effectively liquidated its assets promptly after the closing of the 1969 purchase agreement by distributing the Clark common stock to the former Melroe shareholders. Gwinner's remaining assets consisted of only $50,000, which the 1969 purchase agreement provided for winding up expenses. It had no employees or business activities capable of producing income. Indeed, the former shareholders of Melroe had covenanted not to compete with Clark's business activities. In addition, Clark has not demonstrated that the Kellers could have held the former Melroe shareholders personally liable for the corporation's negligence nor even that the Kellers in 1973, when they filed suit, could have traced the Clark stock to the former Melroe shareholders to whom the shares were distributed after the 1969 closing.
 
 
 72
 Clark's other primary contention is that the de facto merger doctrine is inapplicable here because there is no showing that the 1969 sale was consummated to defraud creditors. We cannot agree.
 
 
 73
 While evidence of fraudulent intent may strengthen the case for finding a de facto merger, such evidence simply is not an indispensable requirement in every case. See supra, at 1291. Indeed, the existence of a fraudulent transfer in and of itself generally is considered to be an exception, in addition to the de facto merger doctrine, to the general rule that a purchasing corporation is not liable for the debts and liabilities of the selling corporation. See Acheson v. Falstaff Brewing Corp., 523 F.2d 1327, 1329-1330 (9th Cir.1975); J.F. Anderson Lumber Co. v. Myers, supra, 206 N.W.2d at 368-369; Annot., supra, 49 A.L.R.3d at 883-890.
 
 
 74
 Accordingly, we find no merit to Clark's objections. The district court, therefore, did not err in finding Clark is liable to the Kellers for Melroe's negligence under the de facto merger doctrine.
 
 IV.
 CONCLUSION
 
 75
 For the reasons stated above, the decision of the district court is affirmed.
 
 
 
 *
 Robert G. Renner, District Judge, District of Minnesota, sitting by designation
 
 
 [1]
 Clark contends that this second agreement was not finalized until late 1964 or 1965. The contract which the parties signed, however, is dated October 1, 1963
 
 
 [2]
 The new fixed royalty schedule was $25 for each of the first 1000 Bobcats sold on a yearly basis and $15 for each additional Bobcat sold during the year. This fixed rate schedule apparently resulted in lower royalty payments than the percentage formula utilized in the 1959 agreement
 
 
 [3]
 Clark initially filed suit in the Western District of Michigan, but the matter subsequently was transferred in August, 1973, to the District of North Dakota
 
 
 [4]
 Prior to this decision, Clark voluntarily dismissed with prejudice its claim against the Williamson law firm, and the Kellers settled their separate action involving the foreign patents and CEAG
 
 
 [5]
 The 117 patent names only Louis Keller and Clifford Melroe as the inventors of the subject claims. The 1963 royalty agreement, however, recognizes both Louis and Cyril Keller as the developers of "certain self-propelled vehicles * * * and a novel drive or transmission system for driving said vehicles." The 1971 agreement refers to Cyril and Louis Keller as "joint owners" of the 503, 117 and 254 patents. Because Cyril Keller is expressly named in the 1963 and 1971 agreements, the district court properly denied Clark's summary judgment motion to dismiss Cyril as a plaintiff in the negligence action. Keller v. Clark Equipment Co., 474 F.Supp. 966, 969-970 (D.N.D.1979)
 
 
 [6]
 It is clear that an employer may contract away--either expressly or impliedly--the patent rights it would possess absent such an agreement. E.g., Aero Bolt & Screw Co. of California v. Iaia, 180 Cal.App.2d 728, 5 Cal.Rptr. 53 (1960)
 
 
 [7]
 Clark also argues that Melroe evinced its intent in 1962 to exercise sole ownership over the 117 patent by sending, at the request of Clifford Melroe, an assignment of the patent to Louis Keller. The court below rejected this argument because the assignment was never executed, Clifford could not recall why it had not been executed, and Louis did not remember ever being asked to sign the document. Under these circumstances, we agree with the district court that the failure of the parties to execute the assignment rebuts any inference of Melroe's intent to claim sole ownership which purportedly results from the fact that the document was sent. Moreover, we agree with the district court that the argument that Melroe intended to claim sole ownership in all inventions developed by its employees tends to be rebutted by the fact that the company attorney prepared a contract in which all employees would agree to assign future patents arising from their employment, but the employees never signed the contract
 
 
 [8]
 When two people jointly make an invention, they must apply for a patent jointly and both must sign the application. 35 U.S.C. § 116. Thus, notwithstanding the Kellers' interest in the 117 patent, neither Clifford Melroe nor the Melroe company would have had an obligation to file the patent application to protect that interest. The district court, however, held that Clifford Melroe, on behalf of the company, assumed that obligation by representing at the May 31, 1962, meeting that the company's attorney would prosecute the application for the 117 patent. Clark does not appeal from this finding
 
 
 [9]
 Although the North Dakota Supreme Court has not addressed this matter, neither party contends that the court below erred in concluding that these principles represent the law in North Dakota
 
 
 [10]
 Section 1.21 stated:
 Section 1.21. No Misleading Statements. Neither the financial statements of Melroe and Melroe, Ltd. * * * nor this Agreement contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein or herein not misleading.
 
 
 [11]
 This construction also controls section 1.11 of the agreement in which Melroe warranted that it did not have "any indebtedness, contingent or otherwise, except as set forth in [its] balance sheets." Melroe, did not breach this warranty by not listing the Kellers' negligence claim because to the best of its knowledge the Kellers were going to continue receiving royalties and they were not intending to assert their claim
 
 
 [12]
 In the 1969 purchase agreement, Melroe transferred all its assets to Clark in exchange for 475,000 shares of Clark common stock worth approximately $15 million. The Melroe operations--including most management officials, employees and assets--became the Melroe Division of Clark. The former Melroe company, in turn, changed its name to Gwinner Holding Company. It agreed to cease business operations, liquidate and dissolve as soon as legally and practically possible
 
 
 [13]
 Delaware revoked Gwinner's corporate charter in 1974 for failure to file an annual report